UNITED STATES of America, Appellee,

v.

**William G. LaCHANCE, William F. Zimmerli, John Schlagenhauf and Thomas Ciccaglione, Appellants.**

No. 1378, Dockets 84–1415, 84–1435, 84–1451 and 84–1453.

United States Court of Appeals, Second Circuit.

Argued June 27, 1985.

Decided April 14, 1986.

858

Holly B. Fitzsimmons, Asst. U.S. Atty., Bridgeport, Conn. (Alan H. Nevas, U.S. Atty., D. Conn., on brief), for appellee.

Nina J. Ginsberg, Alexandria, Va. (Zwerling, Mark, Ginsberg & Lieberman, Alexandria, Va., on brief), for appellant LaChance.

Ira B. Grudberg, New Haven, Conn. (Alice S. Miskimin, Jacobs, Grudberg & Belt, on brief), for appellant Zimmerli.

James Michael Merberg, Boston, Mass., for appellant Schlagenhauf.

M. Yvonne Gonzalez, Boston, Mass., for appellant Ciccaglione.

Before KEARSE and CARDAMONE, Circuit Judges, and WYATT,* District Judge.

---

* The Honorable Inzer B. Wyatt of the United States District Court for the Southern District of

WYATT, District Judge:

These are separate appeals, consolidated in this court, of four defendants—William G. LaChance, William F. Zimmerli, John Schlagenhauf, and Thomas Ciccaglione—named in a superseding indictment returned against them and many other persons by a grand jury in the United States District Court for the District of Connecticut. Appellant Schlagenhauf was named in the superseding indictment as, and is often called in other papers of record, "John Schlaganauf," apparently a misspelling of his surname; for convenience, he will usually be referred to herein as "John." Appellant Ciccaglione will usually be referred to, for convenience, as "Thomas."

This prosecution had its beginnings on September 14, 1983, when the Coast Guard stopped and boarded the sailing vessel "Tho" in Long Island Sound some two miles from the mouth of the Connecticut River in the District of Connecticut. Appellant LaChance was aboard as Captain of the Tho and, after 4,300 pounds of marijuana was found on the ship and seized, LaChance and the two crew members were turned over by the Coast Guard to Drug Enforcement Administration (DEA) agents who placed them under arrest. Marijuana is a Schedule I controlled substance (21 U.S.C. § 812(c) (Schedule I) (c)(10)), the distribution, possession with intent to distribute, and importation of which is unlawful (21 U.S.C. §§ 841(a)(1) and 952).

An indictment was returned on September 21, 1983, by a federal grand jury at Bridgeport in the District of Connecticut. A superseding indictment was returned by the same federal grand jury on March 6, 1984, against the four appellants and many other persons; there were twenty-nine counts in the superseding indictment. The indictment and superseding indictment were assigned to Chief Judge Daly.

The superseding indictment covered a time period from January 1976 to the date it was returned. The subject matter was the importation into the United States of marijuana from the Caribbean and Colombia, and its distribution in the United States, principally in the District of Connecticut. There was a charge against Zimmerli and his brother-in-law Francolini, of engaging in a continuing criminal enterprise (21 U.S.C. § 848); two charges of conspiracy against many defendants, one to import marijuana into the United States (21 U.S.C. § 963) and one to possess and distribute marijuana (21 U.S.C. § 846); and many charges of substantive law violations over a seven-year period for importing marijuana (21 U.S.C. § 952) and for possessing marijuana in the United States with intent to distribute it (21 U.S.C. § 841(a)(1)).

On September 17, 1984, appellant LaChance pleaded guilty to the counts against him in the superseding indictment (counts two, fifteen, sixteen, seventeen, and eighteen) and his plea was then accepted by Chief Judge Daly. In this connection, defendant LaChance was permitted to reserve the right on appeal from the judgment to review of the adverse determination of a motion by him and other defendants to dismiss the indictment to the extent that such motion was based on the improper selection of grand jurors (Fed.R.Crim.P. 11(a)(2)). On November 8, 1984, sentence was imposed on LaChance by the district court; we are told by the government (Brief, p. 4) that the total effective sentence was ten years' imprisonment and a $60,000 fine. On November 15 and 27, 1984, notices of appeal were filed by LaChance. The notice of appeal filed November 15, stated that "LaChance ... hereby appeals ... from the Court's denial of his 'Verified Motion to Dismiss Indictment and Stay Proceedings on Grounds of Substantial Failure to Comply with Law in the Selection of Grand and Petit Jurors'...." The notice of appeal filed November 27, 1984, described the appeal as from the order "entered in this action on May 2, 1984 (Denial of Motion to Dismiss for Failure to Comply with Law in Selection of Grand Jurors)." This appeal was given Docket No. 84–1415 in this court.

New York, sitting by designation.

Trial of the superseding indictment began on September 17, 1984 at Bridgeport before Chief Judge Daly and a jury. The jury returned its verdict on October 17, 1984, against the remaining defendants then on trial.

Appellant Zimmerli was found guilty on counts one through fifteen and eighteen, and not guilty on count twenty-nine. On November 30, 1984, sentence was imposed on Zimmerli by the district court; we are told by the government (Brief, p. 4) that the total effective sentence was eighteen years' imprisonment and a $410,000 fine. On December 6, 1984, a notice of appeal was filed for Zimmerli. This appeal was given Docket No. 84–1435 in this court. We are told in the Brief for appellant Zimmerli (p. 5) that on January 24, 1985, the sentences imposed on counts two and eighteen were vacated, "thereby reducing the 13½ year consecutive sentence by 3 years and cutting the fines imposed by $125,000."

We are told in the Brief for appellant John (p. 2) that the jury found him "guilty on all counts." The record on appeal does not seem to include any transcript of the return of the jury verdict, nor does the Defendants' Joint Appendix. We are told in the Brief for appellant John (p. 2) that he was sentenced, among other counts, on count "twenty-one"; we are puzzled because in the superseding indictment shown in the record on appeal (BV I, document 21; "BV" references are to the two brown volumes in the record on appeal) and in Defendants' Joint Appendix (A177; "A" references are to pages of the Defendants' Joint Appendix), count "twenty-one" does not charge Schlagenhauf. There is a possible explanation for the apparent mistake. John was charged in count twenty-two of the superseding indictment, and the jury found him "guilty on all counts" (Brief, p. 2). According to the judgment of conviction (SA 1; "SA" references are to pages of John's "Supplemental Appendix"), John was not sentenced on count twenty-two. Therefore, the sentence on count twenty-one could have been intended to be on count twenty-two. In any event, we assume that the sentence on count twenty-

one does not affect the time to be served in prison because it was made to run "concurrently to Counts Eighteen and Twenty-Three" (SA 1).

On November 29, 1984, sentence was imposed on John by the district court; we are told by the government (Brief, p. 4) that the total effective sentence was eight years' imprisonment. On December 12, 1984, a notice of appeal was filed for John and for Craig Randall, another defendant in the same superseding indictment and in the same trial. This appeal was given Docket No. 84–1451 in this court. On April 11, 1985, an order of this court was filed dismissing the appeal of Craig Randall on his consent.

Appellant Thomas was found guilty on count twenty-one and not guilty on count eighteen. On November 28, 1984, sentence was imposed on Thomas by the district court; we are told by the government (Brief, p. 5) that the sentence was two years' imprisonment and a $15,000 fine. On December 10, 1984, a notice of appeal was filed for Thomas. This appeal was given Docket No. 84–1453 in this court.

We are told by the government (Brief, p. 5) that the notices of appeal of the four appellants were all "timely filed."

We affirm the several judgments from which these appeals were taken.

### A. *The Appeal of William G. LaChance*

On September 17, 1984, LaChance pleaded guilty to all counts in which he was charged. Chief Judge Daly accepted his plea. LaChance had properly reserved the right to review the denial of his motion to dismiss the indictment to the extent that such motion was based on the improper selection of grand jurors (Fed.R.Crim.P. 11(a)(2)).

As noted earlier, LaChance filed two notices of appeal. One notice states, and the other indicates, that the appeal is from the district court's order denying his motion to dismiss the indictment for improper selection of jurors.

These notices of appeal raise a question not mentioned by the government, but which should be addressed. By stating or indicating in the notices of appeal that his appeal is from the district court's *order* of May 2 denying his motion, LaChance failed to comply technically with Fed.R.Crim.P. 11(a)(2). Rule 11(a)(2) allows a defendant who has entered "a conditional plea of guilty" to reserve the right to review of an "adverse determination of any specified pretrial motion" on "appeal from the *judgment*" (emphasis supplied). Therefore, rather than appealing from the May 2 *order*, LaChance should have stated that his appeal was from the *judgment* of conviction entered against him November 19, 1984. Nevertheless, in light of *Sanabria v. United States*, 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978), we conclude that LaChance's appeal is properly before us. In discussing the effect of mistakes in a notice of appeal, the *Sanabria* Court stated: "A mistake in designating the judgment appealed from is not always fatal, so long as the intent to appeal from a specific ruling can fairly be inferred by probing the notice and the other party was not misled or prejudiced." *Id.* at 67 n. 21, 98 S.Ct. at 2180 n. 21 (citing *Daily Mirror, Inc. v. New York News, Inc.*, 533 F.2d 53, 56 (2d Cir.) (per curiam), *cert. denied*, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 140 (1976)).

Under his reserved right to review of an adverse determination of a pretrial motion, appellant LaChance makes a single argument for reversal of his conviction: that the trial judge was in error in denying, without an evidentiary hearing, his pretrial motion to dismiss the indictment to the extent that such motion was based on the improper selection of grand jurors. This motion had alleged a "substantial and statistically significant underrepresentation" of blacks and women selected as grand and petit jurors, and women selected as grand jury forepersons, in violation of the "fair cross section requirement" of the Jury Selection and Service Act of 1968 (28 U.S.C. § 1861 and following; the "Act") and of the sixth amendment. The motion had also alleged violations of the Act "which affect the random nature and objectivity of the selection process."

1

On February 2, 1984, LaChance and other then co-defendants filed the "Verified Motion to Dismiss Indictment and Stay Proceedings on Grounds of Substantial Failure to Comply with Law in the Selection of Grand and Petit Jurors" (A71), described above. This motion also sought an evidentiary hearing. A supporting affidavit (A78) by Dr. John Lamberth, a statistics expert, accompanied the motion.

On April 27, LaChance and others filed an "Amended Verified Motion" to dismiss the indictment, etc., to correct an error contained in the original motion of February 2.

On May 2, 1984, Judge Daly denied the "Amended Verified Motion" of LaChance for "lack of a sufficient showing" and without an evidentiary hearing, except that he heard argument on the grand jury foreperson issue and reserved decision on that (A136). It is this ruling, to the extent that it denied the motion to dismiss the indictment for improper selection of grand jurors, which LaChance asserts was error, requiring reversal of his conviction.

By endorsed order, filed July 10, 1984, Judge Daly denied the motion of LaChance as to the grand jury foreperson issue (A141). This was on the basis of the then recent Supreme Court decision in *Hobby v. United States*, 468 U.S. 339, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984), settling the issue. In the same order, Judge Daly described his May 2 ruling as follows (A141):

> [T]he Court ruled that, applying the statistical analysis used by the Second Circuit in *United States v. Jenkins*, 496 F.2d 57, 65–66 (1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975), the defendants had failed to make an adequate showing on their claims of discrimination in the overall selection of grand and petit jurors.

The contentions of LaChance as to impropriety in the selection of petit juries and of grand jury forepersons ultimately were

abandoned, in part because the right to review of an adverse determination of these issues was not reserved at the time LaChance entered his guilty plea, in part (it seems fair to assume) because the conviction of LaChance was not by a petit jury, and in part because the *Hobby* decision had settled the grand jury foreperson issue. In consequence, these contentions are not now before us, and will not be referred to hereafter.

### 2

We take note of jury selection procedures as prescribed by the Act and by the District's plan thereunder, so as to place in context the claims of LaChance of underrepresentation of women and blacks as grand jurors.

The District of Connecticut's Plan for Random Selection of Grand Jurors Pursuant to Jury Selection and Service Act of 1968 (1968 as amended) ("Plan"), was adopted by the judges of the District of Connecticut and approved by the Judicial Council of this Circuit, as required by Section 1863(a) of the Act. Although the Plan was not introduced below and is not part of the Record on Appeal, it is a proper subject for judicial notice.

For the purpose of jury selection, the District of Connecticut is divided into three divisions: the Hartford Division, which draws jurors from the counties of Hartford, Litchfield, Windham, and Tolland; the New Haven Division, which draws jurors from the counties of New Haven, New London, and Middlesex; and the Bridgeport Division, which draws jurors from Fairfield County. Plan at 2; *see* 28 U.S.C. §§ 1863(b)(3), 1869(e).

Jurors in the Bridgeport Division are drawn from the voter registration lists of Fairfield County. *See* Plan at 3; *see also* 28 U.S.C. § 1863(b)(2).

After obtaining the voter registration list, the source list, the first step in the jury selection process is to form the "master wheel." The master wheel is composed of the names of persons selected at random from the source list; these constitute one percent of the source list. 28 U.S.C. § 1863(b)(4); Plan at 6. The master wheel is emptied and refilled once every four years. 28 U.S.C. § 1863(b)(4); Plan art. X. The data available to LaChance included the master wheels formed in 1977 and 1981 only. Dr. Lamberth's affidavit accompanying the motion states that "[a]ccording to information supplied by [Mr. Kevin F. Rowe, then Chief Deputy Clerk in charge of jury matters], all data prior to the 1977 wheel has been destroyed" (A79). *See* 28 U.S.C. § 1868 (permitting destruction after four years).

Whenever it is anticipated that jurors will be needed for a pool for service on grand and petit juries, names are drawn at random from the master wheel. 28 U.S.C. § 1864(a); Plan at 6. Each person whose name is so drawn is sent a "juror qualification form," sometimes called a "questionnaire." 28 U.S.C. § 1864(a); Plan at 6–7. According to LaChance's Brief (p. 8), those persons who receive and return a questionnaire constitute the "venire." Neither the Act nor the Plan defines "venire," but, for convenience, we shall use the word as defined by LaChance.

The questionnaire requires the prospective juror to answer enumerated questions regarding qualifications for jury service. He or she must state, among other things, whether an exemption or excusal from juror service is claimed. Qualifications (Art. VII), exemptions (Art. VIII), and excuses (Art. IX) are set forth in the Plan and in the questionnaire. When the questionnaire is returned, a specified district judge "shall determine solely on the basis of information furnished on [the questionnaire] and other competent evidence whether a person is unqualified for, or exempt, or to be excused from jury service." Plan at 3.

Those persons who receive and return a questionnaire and who are not exempted, excused or otherwise disqualified from jury service constitute the "qualified wheel." 28 U.S.C. § 1866(a); Plan at 8.

The Plan provides that from the qualified wheel shall be separately drawn the names of persons to be summoned for service on

grand juries and on petit juries. Separate lists are prepared of those summoned for service on grand juries and on petit juries.

We are here concerned solely with the procedure for selecting a grand jury in the Bridgeport Division. The Plan (art. XV) provides in relevant part as follows:

> Grand jurors shall be selected, drawn, summoned and impaneled on a "divisional" basis at such time as the public interest requires. The names of all grand jurors summoned for service at each seat of Court will be placed in a Special Jury Wheel from which twenty-three names will be drawn by lot for service on the grand jury panel. Each grand jury shall serve for a period of eighteen months at each seat of Court unless earlier discharged by the Court.

The grand jury which returned the indictment and superseding indictment against LaChance and the other appellants was selected under this procedure, beginning with the master wheel formed in 1981. This means that the names of a pool of grand jurors were drawn at random from the qualified wheel (formed from the 1981 master wheel), and those persons were summoned to appear at Bridgeport at some time earlier than September 21, 1983, when the first indictment was returned. The names of the grand jurors were put in a Special Jury Wheel from which were drawn "twenty-three names . . . for service on the grand jury panel." We are not informed by the government or in any of the statistics of LaChance how many names were in the Special Jury Wheel from which the twenty-three members of the LaChance grand jury were drawn. We do know that grand juries normally serve for eighteen months and that there are no peremptory challenges. In consequence, it would seem to us that fewer grand jurors than petit jurors would be needed from which twenty-three names are to be drawn.

Master wheels and qualified wheels for selecting grand and petit juries were formed by the Bridgeport Division in 1977 and in 1981 (Plan art. X, as amended; A79). It is undisputed that the grand jury which returned the superseding indictment against LaChance and the other appellants was derived from the master wheel formed in 1981.

### 3(a)

The argument to this court for LaChance is that the District Court erred in denying his motion to dismiss the superseding indictment without affording him the opportunity to present evidence at a hearing. Although the Brief for LaChance concludes by asking simply for reversal of the judgment against him, we believe that his intent is to ask for reversal *and* for a remand to the District Court for an evidentiary hearing on his claims of improper selection in the Bridgeport Division of the grand jury derived from the 1981 master wheel, which returned the indictment and superseding indictment against him.

### 3(b)

Section 1867(a) of the Act states:

> In criminal cases, before the voir dire examination begins, or within seven days after the defendants discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

Under Section 1867(d), if the defendant files a motion pursuant to Section 1867(a) "containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with the [Act]," then the defendant is "entitled to present in support of such motion the testimony of the jury commission [sic] or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence."

In his motion under Section 1867(a), LaChance submitted a sworn statement that there had been a "substantial failure to comply" with the Act in two ways. First, he stated that the "fair cross section re-

quirement of [the Act] and the Sixth Amendment has been breached"; second, he stated that there had been violations of procedures prescribed by the Act which "affect the random nature and objectivity of the selection process." We consider these allegations in turn.

### 3(c)

The sixth amendment affords every criminal defendant entitled to a jury trial the right to trial "by an impartial jury." The Supreme Court has interpreted this right to mean, among other things, that the pool from which the petit jury is drawn must represent a "fair-cross-section" of the community in which the defendant is tried. *Duren v. Missouri*, 439 U.S. 357, 363, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). The Act extends this fair cross section requirement of the sixth amendment to the pool from which federal grand jurors are selected: "It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861.

To establish a prima facie violation of the sixth amendment's fair cross section requirement, the Supreme Court applies a three-pronged test, under which the defendant must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 364, 99 S.Ct. at 668. This test for a prima facie case under the sixth amendment is also applied in determining whether a motion under the Act states "facts which, if true, would constitute a substantial failure to comply with" the fair cross section requirement of the Act. *United States v. Clifford*, 640 F.2d 150, 154–55 (8th Cir.1981); *see Taylor v. Louisiana*, 419 U.S. 522, 528–30, 95 S.Ct. 692, 696–98, 42 L.Ed.2d 690 (1975) ("Recent federal legislation [the Act] governing jury selection within the federal court system has a similar thrust [to the sixth amendment's representative cross section requirement]"); *United States v. Test*, 550 F.2d 577, 584–85 (10th Cir.1976) (en banc) (Act's fair cross section standard is "functional equivalent of the constitutional 'reasonably representative' standard").

LaChance bases his claim of a fair cross section violation on the Act and on the fifth and sixth amendments. He has spelled out no separate argument on his fifth amendment challenge; in the district court he merely quoted from Justice Powell's dissenting opinion in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), which states that "[t]he right to a 'representative' grand jury is a federal right that derives ... from the Fifth Amendment's explicit requirement of a grand jury. That right is similar to the right—applicable to state proceedings—to a representative petit jury under the Sixth Amendment." *Id.* at 509–10, 97 S.Ct. at 1287–88 (Powell, *J.*, dissenting). We will not, therefore, distinguish between the fifth amendment claim and that based on the sixth amendment. Further, because the *Duren* test governs fair cross section challenges under both the Act and the sixth amendment, our discussion of the statutory challenge also disposes of his constitutional claim.

We now consider the *Duren* test as applied to LaChance's statement that blacks and women are underrepresented on grand juries in the Bridgeport Division.

### 3(c)(i)

Appellant LaChance properly stated in his motion (A74) that both blacks and women constitute distinctive groups in the community. *See Taylor*, 419 U.S. at 531, 95 S.Ct. at 698 (women); *United States v. Jenkins*, 496 F.2d 57, 65 (2d Cir.1974) (blacks), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). Therefore, the first prong of the *Duren* test is satisfied.

### 3(c)(ii)

LaChance attempted to satisfy the second prong of the *Duren* test through a statistical presentation in his amended motion, which we show in the following chart:

Blacks

(6.98% Black Voting Age Population
in District of Connecticut
According to 1980 Census)

| | Comparative Disparity | Number of Standard Deviations From Expected Number | Probability of Occurring by Chance |
|---|---|---|---|
| 1977 and 1981 Venires (COMBINED) | | | |
| (3.52% Black) | 49.57% | 8.46 | less than two in 1,000,000 |
| 1977 and 1981 Qualified Wheels (COMBINED) | | | |
| (4.83% Black) | 30.8 % | 3.69 | less than four in 10,000 |

Females

(53.17% Female Voting Age Population
in District of Connecticut
According to 1980 Census)

| | | | |
|---|---|---|---|
| 1977 and 1981 Qualified Wheels (COMBINED) | | | |
| (49.91% Female) | 8.01% | 3.77 | less than two in 10,000 |

The District Court denied LaChance's motion without affording him the opportunity to present evidence at a hearing because the court had applied to the statistics of underrepresentation stated for La-Chance the "absolute numbers" analysis used by this court in *United States v. Jenkins*, 496 F.2d 57, 66 (1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975) (A141). Appellant La-Chance, in effect, asks us (Brief, p. 17) to overrule *Jenkins* because *Castenada v. Partida*, 430 U.S. 482, 496–97 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977), in an equal protection challenge to Texas' grand jury selection process, made reference to the statistical approach used in the LaChance motion—the standard deviation analysis.

*Jenkins* involved a challenge under the Act to juror selection in the New Haven Division of the District of Connecticut. In appealing from their criminal convictions, the appellants in *Jenkins* argued that the percentage of blacks in the "New Haven jury pool" (determined from "questionnaires sent out") (496 F.2d at 64)—3.3%—was so disproportionate to the percentage of blacks in the adult population—5.45%—as to constitute a substantial violation of the Act. We rejected their contention that whether the disparity was substantial should be determined by "the ratio of the Negro percentage of the adult population to the Negro percentage of those adults available for jury service under the district court's plan." *Id.* at 65. Although we recognized that the approximate 5 to 3 ratio "by itself appears substantial indeed," we were not persuaded by that ratio, but rather held (*id.* at 66):

> The test of fairness intended by Congress is the more practical one of the difference in absolute numbers rather than a difference in percentages. Judged by this standard, a difference of one (1) Negro in a panel of 60 jurors is not substantial.

It follows, then, that under the absolute numbers analysis, it is, as the first step, determined how many members of the allegedly underrepresented group would be expected to appear on the jury panel in order to reflect the percentage of the group in the total population eligible for jury service.

It is next, as the second step, determined how many members of the group would be expected to appear on the jury panel in order to reflect the percentage of the group in the venire or qualified wheel or both, depending on the claim being made. A successful challenge to selection procedures depends on whether the difference between the numbers determined in the two steps is "substantial."

The following chart represents the numbers determined by applying the "absolute numbers" analysis to the 1977 and 1981 *combined* data presented in the LaChance motion. (Some of the figures have been

rounded off.) The *Jenkins* court applied the analysis to the panel derived from the last step in the petit jury selection process accomplished by a random drawing—the petit jury panel of 60. Similarly, we apply the same analysis to the panel derived from the last step in the *grand* jury selection process accomplished by a random drawing—the grand jury panel of 23 (see section A, part 2 of opinion).

*Blacks* (6.98% of eligible population)

Venires (3.52%)

| Panel Size | Expected From Eligible Population | Expected From Venires | Difference In Absolute Numbers |
|---|---|---|---|
| 23 | 1.6 | .8 | .8 |

Qualified Wheels (4.83%)

| | | | |
|---|---|---|---|
| 23 | 1.6 | 1.11 | .49 |

*Females* (53.17% of eligible population)

Qualified Wheels (49.91%)

| | | | |
|---|---|---|---|
| 23 | 12.23 | 11.48 | .75 |

The *Jenkins* court found that the effect of the underrepresentation of blacks in the selection process there considered, measured by the difference in absolute numbers, would be one juror (that is, a correction of the process would add one black to a panel of 60), and that this effect was not "substantial." Application of the absolute numbers analysis to the LaChance statistics shows an effect of the claimed underrepresentation of blacks and women in the selection process here of *less* than the one juror effect held to be not "substantial" in *Jenkins* ("substantial" comes from "substantial failure to comply with the provisions of this title" in Section 1867(d) of the Act). It was for this reason that Judge Daly denied the motion below without an evidentiary hearing.

On this appeal, counsel for LaChance (Brief, pp. 17–23) ask us to abandon and disregard *Jenkins* and to apply a "standard deviation" analysis in determining whether the effect of the claimed violation here was "substantial."

The standard deviation analysis measures the statistical significance of fluctuations from an expected number in a random sampling. For example, if a box were filled with 1,000 slips of paper, 600 of

which were marked "X" and 400 of which were marked "Y", and someone randomly selected 100 slips, the "expected number" of "Y" slips selected would be 40; that is, because the ratio of "X" slips to "Y" slips is three to two, it would be expected that a random selection of 100 slips would yield 60 "X" slips and 40 "Y" slips. However, a statistician would not be surprised if the number of "Y" slips fluctuated, or "deviated," from the expected value of 40. *See Castaneda*, 430 U.S. at 496 n. 17, 97 S.Ct. at 1281 n. 17 ("Of course, in any given drawing some fluctuation from the expected number is predicted.") Rather, the statistician would predict a fluctuation, and that predicted fluctuation from the expected number is the standard deviation. For jury selection purposes, the standard deviation equals the square root of the product of the total number in the sample times the probability of drawing a member of the allegedly underrepresented group times the probability of drawing a nonmember. *Id.* at 497 n. 17, 97 S.Ct. at 1281 n. 17. This formula yields a different result depending on the size of the sample. "One of the principal reasons for using a standard deviation analysis and hypothesis testing is that it is axiomatic in statistical analysis that the precision and dependability of statistics is directly related to the size of the sample being evaluated." *Moultrie v. Martin*, 690 F.2d 1078, 1083 (4th Cir.1982); *see generally Castaneda*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498; *Villafane v. Manson*, 504 F.Supp. 78 (D.Conn.1980); Finkelstein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases*, 80 Harv.L.Rev. 338 (1966).

Recalling the above sample of a box filled with "X" and "Y" slips, if a sampling from the box resulted in selection of a number of "Y" slips substantially fewer than the expected value, and hence more than a certain number (depending on the sample size) of standard deviations below the expected value, a statistician would question if the sampling was random. In *Castaneda*, the Supreme Court stated that "[a]s a general rule for such large samples

[870], if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." 430 U.S. at 497 n. 17, 97 S.Ct. at 1281 n. 17. Relying on *Castaneda*, LaChance argues that the second prong of the *Duren* test (group representation in jury venires not "fair and reasonable") is satisfied by his allegations of differences between the expected values and observed numbers of 8.46 standard deviations as to blacks on the venires, 3.69 standard deviations as to blacks on the qualified wheels, and 3.77 standard deviations as to females on the qualified wheels. The government argues (Brief, p. 18), however, that *Jenkins* is still controlling because *Castaneda* decided an equal protection challenge, which involves a showing of discriminatory intent. *Castaneda*, 430 U.S. at 494–95, 97 S.Ct. at 1280–81. Because LaChance's statistical presentation does not, as will be seen later, establish the *degree* of underrepresentation on the 1981 venire and qualified wheel, we need not decide whether the standard deviation analysis should apply to the cross section challenge here made or, if it should, whether the number of standard deviations alleged would satisfy the second prong of the *Duren* test. *See Castaneda*, 430 U.S. at 497 n. 17, 97 S.Ct. at 1281 n. 17 (disapproving differences of 29 and 12 standard deviations between expected and observed numbers in two samples—greater differences than claimed by LaChance here). This is because LaChance has not stated facts as to the 1981 sources, from which the grand jury which indicted him was derived, so as to enable us or the court below to apply *either* the "absolute numbers" analysis of *Jenkins* or the "standard deviation" analysis which he urges on us. LaChance has, therefore, not made a "sufficient showing," as the court below properly ruled.

Before it can be determined, under the absolute numbers analysis, the standard deviation analysis, or any other statistical analysis, whether the claimed underrepresentation is "substantial" (28 U.S.C. § 1867(d)), two percentages must be shown. First, the defendant " 'must demonstrate the percentage of the community made up of the group alleged to be underrepresented.' " *United States v. Goodlow*, 597 F.2d 159, 162 (9th Cir.) (quoting *Duren*, 439 U.S. at 364, 99 S.Ct. at 668), *cert. denied*, 442 U.S. 913, 99 S.Ct. 2830, 61 L.Ed.2d 280 (1979). Second, the defendant "must show the percentage representation of the groups in question on jury venires." *Id.*

The statistical presentation made for LaChance has two striking features: First, it purports to compare *statewide* population data with *Fairfield County* jury selection data; and second, it *combines* jury selection data for 1977 and 1981, whereas the grand jury which indicted LaChance and the other defendants was derived from the master wheel of 1981 only.

### 3(c)(ii)(A)

■ LaChance attempted to "demonstrate the percentage of the community made up of the group alleged to be underrepresented" by comparing the percentage of blacks on the venires and qualified wheels, and the percentage of women on the qualified wheels, in the *Bridgeport Division* (Fairfield County only) with *district wide* (all of Connecticut) black and female voting-age populations. The government argues (Brief, pp. 12–13) that because "[t]here is no basis for concluding that Fairfield County [from which juries in the Bridgeport Division are drawn] has the same percentage of blacks in its voting-age population as Connecticut as a whole.... [t]he entire basis for comparison is suspect." (This argument applies equally to LaChance's allegations with regard to the underrepresentation of women.) In response to this argument, counsel for LaChance asserts that the district court's denial of a hearing precluded defendants "from explaining their use of district-wide voter data" (Reply Brief, p. 2.). Further, at oral argument, counsel for LaChance argued that these were the "best available statistics" and that "many courts have used district-wide statistics when they are

measuring a smaller division." Our research shows, however, that the voting-age populations of blacks and females, as stated by LaChance in his motion below (BV II, LaChance Document No. 10), mistakenly identified by counsel for LaChance (in the motion and also Brief, pp. 8, 9, 10, and Reply Brief, p. 2) as "in the District of Connecticut" or "district-wide," are in fact the voting-age populations for *Fairfield County only*. According to I United States Bureau of Census, United States Department of Commerce, 1980 Census of Population 8–200 (1982), the black voting-age population of Fairfield County (blacks age 18 and over: 41,176) is 6.98% of the total voting-age population of Fairfield County (all persons age 18 and over: 589,669). The female voting-age population of Fairfield County (females age 18 and over: 313,520) is 53.168% of the total voting-age population of Fairfield County. By contrast, the statewide black and female voting-age population percentages are, respectively, 5.97% and 52.8%. *See id.* at 8–24 to 8–27. Thus, the voting-age population percentages stated by LaChance of blacks (6.98%) and females (53.17%) were in fact percentages of *Fairfield County's* voting-age population and, therefore, served as proper bases of comparison for the percentages of blacks on the Bridgeport Division venires and qualified wheels and of females on the Bridgeport Division qualified wheels.

We conclude, therefore, that LaChance has adequately stated "the percentage of the community made up of the group[s] alleged to be underrepresented [blacks and women]." *Duren*, 439 U.S. at 364, 99 S.Ct. at 668, *Goodlow*, 597 F.2d at 162.

### 3(c)(ii)(B)

■ The percentage of the community represented by blacks and women is to be compared, under the absolute numbers analysis and under the standard deviation analysis, with the percentage of blacks and women in the jury pool (venire, qualified wheel) from which the 23 member grand jury was derived. The statistical presentation made for LaChance did not contain any

data from which this percentage could be calculated because it *combined* jury selection data for the 1977 and 1981 venires, and *combined* data from 1977 and 1981 qualified wheels, whereas the grand jury which indicted LaChance was derived from the venire and qualified wheel of 1981 only.

In an effort to establish the degree of underrepresentation of blacks and women on grand juries in the Bridgeport Division, LaChance examined data from the 1977 and 1981 venires and qualified wheels. Rather than presenting the data from each year separately, however, LaChance *combined* the 1977 and 1981 data. He thereby prevented the court below, and now prevents us, from determining the degree of underrepresentation on the 1981 venire and qualified wheel. Thus, LaChance has failed to allege "facts which, if true, would constitute a substantial failure to comply" with the Act's fair cross section requirement.

LaChance was indicted by a grand jury derived from the 1981 master wheel (Brief for LaChance, p. 7) which was emptied and refilled in 1981 pursuant to the Act and the Plan. (See section A, part 2 of this opinion.) Section 1861 of the Act entitled LaChance to a grand jury "selected.... from a fair cross section of the community." Under the Act, "[d]efendants, of course, may challenge only improprieties affecting the *particular* grand jury which indicted them." *United States v. Bearden*, 659 F.2d 590, 601 (5th Cir.1981) (emphasis in original), *cert. denied*, 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982). Therefore, although the 1977 data may be relevant in determining whether underrepresentation on the 1981 sources is due to systematic exclusion ("that is, inherent in the particular jury-selection process utilized," *Duren*, 439 U.S. at 366, 99 S.Ct. at 669), LaChance would not be entitled to any relief based solely on claimed underrepresentations in the 1977 venire and qualified wheel.

By combining the 1977 data with the 1981 data, LaChance made it impossible for the court below, and now for us, to deter-

mine the degree of underrepresentation, if any, in the 1981 sources. For example, it is possible that the underrepresentation was very high on the 1977 venire and master wheel but nonexistent or very low on the 1981 venire and master wheel. These circumstances make meaningless the number of standard deviations claimed by La-Chance for the 1977 and 1981 data taken together. Combining the data prevents discovery of any absence of, or insubstantial nature of, any underrepresentation in the 1981 venire and qualified wheel. La-Chance argues that, had he been afforded an evidentiary hearing, "Dr. Lamberth could have testified that combining the 1977 and 1981 data allows for a larger sample which in the discipline is considered more stable and produces more reliable results" (Reply Brief, p. 2). This argument is without merit. The burden was on La-Chance to state "facts which, if true, would constitute a substantial failure to comply" with the Act's fair cross section requirement. LaChance was entitled to an evidentiary hearing only if his motion made out a prima facie case. He was not entitled to a hearing to explain why he did not make out a prima facie case.

This is not a case such as *Duren*, in which the Supreme Court accepted use of six year old census data in the absence of "evidence ... in the record to suggest that [the old census data] significantly distorted" the statistical presentation, 439 U.S. at 365, 99 S.Ct. at 669. Here, through extensive discovery (*see* Brief for LaChance, pp. 6–7), appellants had available to them the data to make a meaningful statistical presentation, but did not do so. We rejected the use of overbroad statistics in *United States v. Newman*, 549 F.2d 240 (2d Cir. 1977). That case involved a claim that the government used its peremptory challenges to exclude blacks from petit juries in the New Haven Division of the District of Connecticut. In examining the claim, the district court had combined data regarding petit juries in the New Haven and Hartford Divisions. We stated (*id.* at 244):

> It is only the New Haven Division and its procedures for selecting the jury in this case which are relevant. By merging the New Haven Division statistics with those of the Hartford Division, the district court has ... greatly distorted and arbitrarily altered the statistics of the New Haven Division which are, as thus changed, made useless.

Similarly, the merging by LaChance of the 1977 and 1981 data may have "greatly distorted and arbitrarily altered" the 1981 data.

Even if LaChance's statements of fact regarding the 1977 and 1981 combined data are true, those facts would not "constitute a substantial failure to comply" with the Act's fair cross section requirement as to the 1981 venire and qualified wheel, from which the indicting grand jury was derived. LaChance was, therefore, not entitled to an evidentiary hearing on his fair cross section challenge, and the denial of his motion below, without a hearing, must be sustained.

### 3(c)(iii)

Because we have concluded that La-Chance failed to satisfy the second prong of the *Duren* test, we need not consider whether he stated facts sufficient to satisfy the further aspect of that test, that the claimed underrepresentation was due to "systematic exclusion."

### 3(d)

■ LaChance also stated in his motion what were claimed to be violations of the Act "which affect the random nature and objectivity of the selection process" (A75). Such violations were alleged to have included: (1) "Erroneous permanent disqualifications, exemptions, excusals or exclusions, based upon insufficient medical documentation," "previous jury duty," "occupation," "child care," and "student status"; (2) "Usurpation of judicial functions by jury clerks"; (3) "Temporary or permanent disqualifications, exemptions, excusals, or exclusions, exceeding one per centum of the number of persons who return executed juror qualification forms during the period specified in the Plan between two consecutive filling[s] of the master jury wheel"; and (4) "Erroneous inclusion of permanent-

ly excused and exempted jurors in the qualified wheel." Finally, it was alleged that "[o]ut of 2040 disqualified juror questionnaires examined, 232 were disqualified inaccurately, constituting an error rate of 11.37%" (A76).

These claimed violations of the Act's requirement of selection "at random" are insufficient for the same reason as is the LaChance statistical presentation on the claimed underrepresentation of women and blacks. It was impossible for the court below, and now is impossible for us, to determine the extent of the "at random" violations in the selection of grand jurors derived from the master wheel formed in 1981. For example, we are not told how many, if any, of the "[e]rroneous permanent disqualifications, exemptions, excusals or exclusions" were issued to jurors drawn from the 1981 master wheel; we are not told when the alleged "[u]surpation of judicial functions by jury clerks" occurred; nor are we told how many, if any, of the 232 jury questionnaires "disqualified inaccurately" had been sent to persons drawn from the 1981 master wheel.

■ The Act entitles a defendant to present evidence at a hearing if the facts stated in the motion would, "if true, constitute a substantial failure to comply" with the Act. 28 U.S.C. § 1867(d). Mere "technical" violations of the procedures prescribed by the Act do not constitute "substantial failure to comply" with its provisions. *United States v. Carmichael*, 685 F.2d 903, 911 (4th Cir.1982), *cert. denied*, 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 434 (1983); *United States v. Capone*, 683 F.2d 582, 589 (1st Cir.1982); *Bearden*, 659 F.2d at 601. Whether a violation is "substantial" or merely "technical" depends upon the nature and extent of its effect on the wheels and venire from which a defendant's grand jury was derived. Because the nature and extent of the claimed violations as to the 1981 wheels and venire cannot be determined from the LaChance motion, there was not statement of "facts, which, if true, would constitute a substantial failure to comply" with the Act's requirement of

selection "at random." In this aspect also, Chief Judge Daly properly denied LaChance's motion without an evidentiary hearing, and his ruling must be sustained.

## B. *The Appeal of William F. Zimmerli*

Appellant Zimmerli was found guilty on October 17, 1984, on all counts in which he was named, save for count twenty-nine. He was found guilty on count one, engaging in a continuing criminal enterprise (21 U.S.C. § 848); on count two, conspiracy to import marijuana into the United States (21 U.S.C. § 963); on counts three, five, seven, nine, eleven, thirteen, and fifteen, importation of marijuana into the customs territory of the United States and into the District of Connecticut (21 U.S.C. § 952); on counts four, six, eight, ten, twelve, fourteen, and seventeen, possession of marijuana with intent to distribute (21 U.S.C. § 841(a)(1)); and on count eighteen, conspiracy to possess with intent to distribute, and to distribute, marijuana (21 U.S.C. § 846). Zimmerli was found not guilty on count twenty-nine, bribery of a witness (18 U.S.C. § 201(h)).

Counsel for appellant Zimmerli make four arguments for reversal of his conviction. The first and second arguments are based on a search for, and seizure of, items under a search warrant for the "family dwelling" of Zimmerli at Glastonbury, Connecticut on September 15, 1983. While not expressly stated, presumably the claim is that the search and seizure violated the constitutional rights of Zimmerli, that the motion to suppress seized evidence should have been granted, and that the conviction should be reversed for admission of any of this evidence. The first and second arguments are presented in the brief to this Court for Zimmerli. The third argument is based on the denial by the trial judge of a pretrial motion for Zimmerli to dismiss the superseding indictment because the grand jury which returned it had been selected in violation of the Constitution and of the Jury Selection Act in that women and blacks were not proportionately represented. This argument is not discussed in the

brief for Zimmerli, who relies (Brief, p. 49) in this respect on the brief for appellant LaChance. The fourth argument is based on the denial by the trial judge of a motion by Zimmerli, after the completion of the jury voir dire at the beginning of the trial, to strike the petit jury venire and for other relief. The ground for the motion was that the petit jury venire did not contain a fair cross section of young adults. The fourth argument is not discussed in the brief for Zimmerli, who relies (Brief, p. 49) in this respect on the brief for appellant John.

### 1(a)

On Friday, September 14, 1983, 308 bales (4,300 pounds) of marijuana were seized on the sailing vessel "Tho" in Long Island Sound; the three men on board—La-Chance, Stanko, and Busby—were turned over by the Coast Guard to Drug Enforcement Administration (DEA) agents, who placed them under arrest. Busby was interrogated and gave information to DEA, which since 1979 had been receiving information considered reliable linking Zimmerli to imports of large amounts of marijuana in sailing vessels from the Caribbean to New England, mostly to Connecticut. Further information implicating Zimmerli was obtained by DEA on September 14 and 15. Zimmerli had his home in Glastonbury, Connecticut, a town on the Connecticut River, a few miles south of Hartford.

On Saturday, September 15, 1983, shortly before 5:03 p.m., DEA applied to Magistrate Thomas P. Smith in the District of Connecticut for a search warrant. An affidavit of Michael W. Meyrick, a DEA agent, was submitted in support of the application. The search was asked for the "single family dwelling" of Zimmerli at 37 Ledgewood Drive, Glastonbury. The affidavit recited the seizure aboard the "Tho" (of German registry) of 308 bales of marijuana the day before (the 4,300 pounds); that Tho was boarded about 2 miles from the mouth of the Connecticut River; that at the time of boarding "charts on board were opened to navigation charts for that river"; that Busby, a member of the Tho crew, had told Meyrick that Tho had picked up the contra-band marijuana two weeks before in Jamaica and had sailed for Connecticut for offloading along the Connecticut River; that Busby was to be paid $50,000 upon delivery offloading; that he was told by the other crew members to make no statement if arrested but to call "attorney John Mark-Flowers"; that Stanko called an attorney in Montana, who referred him to Goldfarb, an attorney in Hartford, and told him to advise Goldfarb of his arrest; that since 1979 the DEA had received reliable information that Zimmerli was "a large-scale marijuana smuggler" running "several boatloads a year"; that Zimmerli's lawyer was Alexander Goldfarb of Hartford; that at about 2 p.m. on September 15 an agent had called the home of Zimmerli and claimed to be a "friend" of LaChance, advising that there was "trouble"; and that Joy Zimmerli, wife of William, replied that her husband had suspected trouble and was off in an airplane "looking" (GA 2–4; "GA" references are to pages of the Appendix to the Government's Brief). The affidavit further stated that about 3 p.m. on September 15, agents "observed at least two Vans in the driveway and approximately eight persons in the yard" at the Zimmerli house in Glastonbury; and that vans are used "as offshore loading vehicles by marijuana smugglers."

The Magistrate issued a search warrant at 5:03 p.m. on September 15. The warrant authorized a search of the premises in Glastonbury and of "two vans" parked on the premises. The property which the warrant authorized to be searched for and seized was described as follows:

"money intended to be furnished in exchange for controlled substances; records of dealing in controlled substances; and documentary evidence of the involvement of William and Joy Zimmerli in the conspiracy to smuggle approximately 4,300 pounds of marijuana into Connecticut aboard the 'Tho'."

The search warrant was executed on the same day issued, Saturday, September 15, 1983, beginning about 6:30 p.m. (A247). Many items were seized.

A motion was filed for Zimmerli on November 7, 1983, to suppress as evidence *all* of the items seized in the search of the home in Glastonbury. The grounds were said (A43) to be (1) no "probable cause" shown for issuance of the search warrant; (2) the supporting affidavit had "reckless and/or deliberate untruths and significant omissions"; (3) the warrant was "overly broad, general and vague as to what property the agents were empowered to search for and seize"; and (4) the "scope of the search far exceeded the limits set ... by the warrant...."

On December 6, the trial judge fixed December 19, 1983 for hearing of the motion by Zimmerli to suppress the evidence seized at his home.

On December 14, an affidavit of counsel for Zimmerli, sworn to December 13, was filed in support of his motion to suppress (A45–48).

On December 16, the government filed a "response to amended motions to suppress" (A49–50). Apparently, the government treated the December 13 affidavit of counsel as an amendment to the Zimmerli motion to suppress.

On December 19, 1983, evidence was presented on the motion to suppress before Chief Judge Daly; there was a further hearing on January 9, 1984, which completed the presentation of evidence. A docket entry for that date states that decision was reserved (A4).

On September 17, 1984, when the trial began, Chief Judge Daly rendered his decision on the motion to suppress from the Bench (T104–06; "T" references are to pages of the stenographic transcript). He found that the warrant was "supported by probable cause" (T104), citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). As to whether the affidavit on which the warrant was granted was false in any respects, Chief Judge Daly ruled that, to the extent that there were any material omissions or misstatements in the affidavit, the evidence did not establish that "they were made deliberately or in reckless disregard for the truth" (T104),

citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). As to the description of the search items in the warrant, the trial judge ruled that the description "was sufficient and more specificity could not properly be expected," citing *United States v. Balsamo*, 468 F.Supp. 1363, 1391 (D.Me.1979). As to the execution of the warrant in seizing "non-financial items" (T106), the trial judge upheld the seizure. As to "financial or expenditure evidence.... seized pursuant to Agent Hoyt's theory of plain view tax violation" (T105), the trial judge deferred a ruling pending disclosure by the government of which documents it planned to offer (T105).

On September 19, 1984, Chief Judge Daly suppressed as evidence "those financial items ... seized pursuant to the Government's theory that they were evidence in plain view of a tax violation" (T153). The suppressed items were those "listed in the government's submission of yesterday's date [September 18, 1984]" (T154). The "submission" is a part of the record (A54). The reasoning of Chief Judge Daly in reaching this result was set out by him orally (T153–54).

During the trial, on October 2, the government filed a "Motion to Reopen Hearing on Motion to Suppress and for Clarification And/or Reconsideration of Ruling" (A61–63). The government urged reconsideration of the ruling on the "plain view exception to the warrant requirement" and also to consider, for the period after discovery (during the search) of the "Zimmerlis' tax returns," the theory of seizure "to document the ... expenditures in excess of income." The trial court did reopen the hearing and, in the absence of the jury, took further evidence on October 2 and 3 (T1861–1931, 2075–2194).

At the end of the hearing on October 3, the trial judge made his ruling. He found that the searching officers were properly on the premises and, of course, he knew that the cause of the application for a search warrant was the Tho importation, which had been halted and prevented the day before the issuance of the warrant.

The trial judge found that, in the search for the Tho items, "the other items were uncovered and as to at least some of the specified documents under the plain view doctrine they were properly seizable as evidence of criminal activity" (T2193–94). He indicated that, as to two or three of the documents, he had "some problems" and that he would "rule with more specificity in the morning." We have not found the further ruling thus anticipated, and we assume that those two or three documents were not admitted into evidence.

### 1(b)

The argument for appellant Zimmerli seems in large part directed more to a motion to suppress evidence than to reversal of a criminal conviction. There is a general discussion of a "prohibited general search" (e.g., Brief, p. 13 and following) and of how "the 'plain view' exception does not apply" (e.g., Brief, p. 40 and following). It would, however, be difficult for us to see why, in view of the overwhelming evidence aside from that seized in the search at issue, a conviction of Zimmerli for numerous serious drug offenses should be reversed because of a generalized claim of misconduct in the execution of a search warrant.

Zimmerli points (Brief, p. 12) to some evidence seized in the search which was received in evidence. These are (a) pictures and letters establishing ownership by Zimmerli of an expensive home in St. Barthelemy in the French West Indies; (b) documents showing a financial interest of Zimmerli in sailboats used in some of the drug importations; (c) tax returns of Zimmerli and his wife, and associated records; and (d) notes of receipts from imports of marijuana and payments to participants in the smuggling. The items in (b) and (d) seem clearly within the warrant as records of dealing in controlled substances. The items in (a) seem within the warrant because they show associations between Zimmerli and his wife and others engaged in their marijuana operation; for example, the photographs show Anne Taylor with Mrs. Zimmerli and others (T2500; Anne Taylor was indicted and was alleged in the indictment to have been a crew member on sailboats used in the drug smuggling (A152)). The items in (c), principally the tax returns, are not so clearly within the warrant, but we understand from the record (T303) that they were found within an hour to an hour and a half after the search began and *after* some $280,000 in currency had been found in the house. They seem to us, therefore, to be evidence of a crime found by officers making a search under a valid warrant; the income tax returns showed income of the Zimmerlis for 1980 of $14,910, for 1981 of $31,900, and for 1982 of $51,330 (T304); to the officers, therefore, the expenditures obviously made by the Zimmerlis for houses, trips, automobiles, sailboats, and the like, plus a sum of $280,000 in currency found in the house, showed "expenditures.... far in excess of [the income on their tax returns], a pretty good indication they filed a fraudulent return" (T305–06). The financial records would also be relevant in showing "substantial income or resources," part of the definition of a "continuing criminal enterprise" (21 U.S.C. § 848(b)(2)(B)).

Before discovery of the tax returns, Supervising Agents Hoyt and DiCarlo required that they approve any item seized by other agents; after discovery of the tax returns, all items in the financial records which showed expenditures by the Zimmerlis were authorized to be seized by any agent as evidence of an offense within plain view (T303–07). We are told by the government, however, that "documents from this category were not offered at trial" (Brief, p. 36).

We realize that, under *Chapman v. California,* 386 U.S. 18, 26, 87 S.Ct. 824, 829, 17 L.Ed.2d 705 (1967), it may well be that the burden of proof was on the government to show that any error in the admission of evidence seized in the search was "harmless" beyond a reasonable doubt, but we believe that the government, if it had such a burden, met the burden.

### 1(c)

Appellant Zimmerli makes no argument here that the warrant was not supported by a showing of probable cause, believing that *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), would "preclude review" of the finding of probable cause below (Brief, p. 18 fn. 1). We have, however, examined the affidavit on which the warrant issued and agree with Chief Judge Daly's determination that probable cause was there shown. We take note of the "totality of the circumstances" and of the "traditional deference to the probable-cause determinations of magistrates," *Illinois v. Gates*, 462 U.S. 213, 230, 237, 103 S.Ct. 2317, 2327, 2331, 76 L.Ed.2d 527 (1983), such determinations having been here upheld by Judge Daly after considerable evidence and discussion.

### 1(d)

■ The argument for Zimmerli begins (Brief, pp. 13–18) with an attempt to bring the affidavit submitted for the search warrant within *Franks v. Delaware*, 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978), which in substance allows impeachment of a warrant affidavit for "a deliberately or recklessly false statement." It is claimed that the "heart" of the warrant affidavit is its statement that surveillance of the Zimmerli premises at 3 p.m. on September 15 revealed that "eight persons were congregated outside near two vans parked in the driveway" (Brief, p. 14). We have reviewed the affidavit with some care, and, while the congregating of people and the presence of a van or vans at Zimmerli's house tend to show his connection with the Tho drug cargo, they are far from the "heart" of the probable cause shown in this instance. In any event, there was an issue of fact in the testimony covering these events, and the testimony of two agents (T128, 145–47), if accepted, would support the statements in the warrant affidavit. The testimony for Zimmerli was given by Jordan and Leonard, who testified that they were at the Zimmerli house on the afternoon of September 15, that there were fewer than eight people in the driveway, that one van was there instead of two, and that the time was nearer 4:30 p.m. than 3 p.m. The differences are of no great significance, even if the testimony of Jordan and Leonard be accepted. But some skepticism is justified in appraising these witnesses for Zimmerli. At the time they were testifying, both had been indicted, along with Zimmerli; they, among others, were named in the two conspiracy counts. The indictment alleged that Leonard had taken part in the off loading of marijuana, that Jordan had served as a crew member of sailboats bringing drugs to Connecticut, and that Leonard had carried out of the United States currency belonging to Zimmerli. That Jordan and Leonard were themselves at the Zimmerli house on September 15, tended to establish probable cause, whatever the number of others there may or may not have been. We are satisfied on the record that there is no evidence of any deliberate or reckless disregard of the truth in the warrant affidavit.

### 1(e)

■ Appellant Zimmerli argues that the description of the items to be searched for is "unconstitutionally vague" (Brief, p. 28) and "overbroad and vague" (Brief, p. 27). We are unable to accept the argument. Under the background circumstances of the issuance of the search warrant, we are satisfied that the description of the property objects of the search "was sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." *United States v. Vargas*, 621 F.2d 54, 56 (2d Cir.), *cert. denied*, 449 U.S. 854, 101 S.Ct. 150, 66 L.Ed.2d 68 (1980).

### 1(f)

■ A last argument, much stressed by counsel for Zimmerli, is that the execution of the warrant, the search, was a "prohibited general search" (Brief, p. 34; also pp. 13, 19–22, 25–26, 34–49). In making this argument, reliance is on cases such as *Coolidge v. New Hampshire*, 403 U.S. 443,

91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), which disapprove "a general exploratory search" and "general, exploratory rummaging in a person's belongings" (403 U.S. at 466, 467, 91 S.Ct. at 2038). Appellant Zimmerli, in making his point, considerably exaggerates; for example, "the searching agents abandoned any pretense of restraint; constitutional requirements ... were flagrantly disregarded ..." (Brief, p. 34), "wholesale rummaging at will" (Brief, p. 36), "a massive general search" (Brief, p. 36), "[i]ndiscriminately seizing virtually every document in the house" (Brief, p. 38), "agents ... conducted a dragnet search for many hours" (Brief, p. 20), "Thousands of documents ... were seized...." (Brief, p. 21).

After a review of the record, we feel that a more balanced view is required. The officers who made the search did have a valid warrant authorizing them to do so. The premises to be searched—the house—were "large" (T1868). The condition of the house was "messy"; there were papers, for example, "piled on top of every flat surface including the floor" (T1870). The time period to be covered was indefinite but lengthy. While the search was occasioned by seizure of the Tho on the day before, one of the objects of the search, "records of dealing in controlled substances," would go back a number of years because DEA had information going back to 1979 of marijuana smuggling by Zimmerli. The officers were obliged to look at a "tremendous quantity of evidence" (T1870). This required ultimately 10 to 15 people from DEA and other agencies (T1869). Money (currency) in large amounts was found "early on" in the search (T1873); the money was in total some $280,000, but it was apparently found in several different places (see items listed in government brief at p. 26); the evidence was that "seven people were involved in counting" the money (T1886) and the count "took hours" (T1886).

The search was a disciplined one; before the tax returns were found, any seizure required the "specific approval" of Supervising Agents DiCarlo and Hoyt (T258), who tried to be "as selective as possible" (T291). After the tax returns were found, after consulting with an Internal Revenue Agent, Hoyt instructed the agents to take financial records in plain view which indicated expenditures by the Zimmerlis since this had "a new significance" in view of the "indication they filed a fraudulent return" (T306).

The agents had a reasonable explanation for the seizures made. They took photographs, not a high percentage of those found, but mostly of "sailboats to attempt to identify them" because "Mr. Zimmerli had utilized [them] to smuggle on" (T1872) and of "individuals" to identify them as "an off-loader, a boat person, a marijuana salesperson, that sort of thing" (T1872), including unnamed co-conspirators Cornelio and Swider, whom the agent DiCarlo recognized (T1872). The agents seized no more than ten to fifteen per cent of the total number of photographs (T1871).

A seizure, made during the search, of which Zimmerli complains (Brief, p. 12), was of a notebook, received as Government Exhibit 20, which is said to be "damaging" because it shows receipts from marijuana importations by Zimmerli of "in excess of $2,000,000 by early August 1981, from the June importations, with coded indications of payment to various of the participants." It is easy to see that this evidence is "damaging," but it falls squarely within the search warrant description of "records of dealing in controlled substances."

Finally, we are impressed by the testimony of Supervising Agent DiCarlo that the items seized during the September 15 search amounted to "somewhere between" one to two per cent of the material examined.

### C. *The Appeal of John Schlagenhauf*

Appellant John was found guilty by the jury on all counts in which he was named: conspiracy to distribute and to possess with intent to distribute marijuana (21 U.S.C. § 846) (count eighteen) and several substantive offenses of possession of marijua-

na with intent to distribute (21 U.S.C. § 841(a)(1)).

Counsel for appellant John make two arguments for reversal of his conviction.

### 1(a)

The first argument is that the trial judge was in error in denying a motion to strike the then petit jury panel and to summon a new panel, or, alternatively, to call in the eighteen "veniremen [who were part of the panel originally summoned but] who failed to appear"; the ground of the motion was "that there was a substantial underrepresentation [thus in original] of young adults on the panel" (Brief for John, p. 8).

### 1(b)

■ The selection of the jury began on Monday, September 17, 1984. The trial transcript (T116–17) shows that "jury voir dire" was completed that day. The trial judge then turned to "challenges for cause" (T117). At this point, counsel for appellant Zimmerli raised an objection orally at the sidebar that the jury panel was not representative because there were "more older people than younger people" (T117). The judge declined to hear the objection at that time but said he would hear it later.

On September 19, 1984, counsel for Zimmerli filed a written motion "to strike jury panel and to summon new veniremen" or, alternatively, to summon eighteen of the original panel who had not responded to a summons. The ground for the motion was that the jury panel was "grossly disproportionate in its drastic underrepresentation of younger adults"; the motion was based on the theory that the petit jury panel was not a fair cross section of the community and thus not an "impartial jury" as required by the sixth amendment. This motion was heard by the trial judge on September 19, 1984 (T135–50). Counsel for other defendants, including appellant John (T146), joined in the motion. Chief Judge Daly denied the motions from the Bench on the ground that they were not timely and were not supported by a "sworn statement under oath" (T150), as required by 28 U.S.C. § 1867(d).

It is difficult to determine the basis for the argument of appellant John on this point. Apparently, it is based on the denial of the motion below "without an evidentiary hearing or findings" (Brief, p. 11). But counsel for appellant John did not argue the motion below, and did not ask for any "evidentiary hearings or findings"; nor were such hearings or findings asked for by counsel who did argue the motion (T135–42, 149–50).

It is not here claimed that there was any violation of the Act in respect of juror age (28 U.S.C. § 1861 and following), nor could there have been any such claim since the motion below did not comply with the Act. It was not timely in that it was not made "before the voir dire examination begins" (28 U.S.C. § 1867(d)) and in that it did not contain a "sworn statement of facts" as also required by the Act (28 U.S.C. § 1867(d)). For these reasons, the motion was properly denied below (T150).

When the motion was presented below, the movant appears to have disclaimed any contention that there was any deliberate exclusion of younger jurors (T141), or that there was any violation of the Act or any violation of federal constitutional rights in picking the array from which the jury was chosen (T146, 149). The motion below appears to have been based on "the inherent power and discretion" of the trial Court "to govern proceedings before it" (T141). This seems to be the argument for John here; the relief asked in this respect is said (Brief for John, p. 11) to have been "well within the supervisory power of the [trial] court."

In judging whether there was an abuse of discretion in this instance, it must be noted that the Courts of Appeals have uniformly held that age groups are not "distinctive" enough for sixth amendment (fair cross section) purposes, as "distinctive" was used in *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). Counsel for appellant John were able to cite (Brief, p. 9–10) a First Circuit decision to the contrary: *Barber v. Ponte*, 772 F.2d 982 (April 4, 1985). Since the

argument before us, however, the First Circuit en banc has vacated the cited decision and now holds that age groups are not "distinctive" enough for sixth amendment purposes. *Barber v. Ponte*, 772 F.2d at 996 (September 18, 1985). This court may not have squarely decided the point, but it has "certainly indicated sympathy for the majority view." *Brown v. Harris*, 666 F.2d 782, 784 (2d Cir.1981), *cert. denied*, 456 U.S. 948, 102 S.Ct. 2017, 72 L.Ed.2d 472 (1982).

We are unable under the circumstances here to find any abuse of discretion by the trial judge in denying the motions to strike the petit jury panel.

### 2(a)

The second argument for John is that the government prevented him "from obtaining exculpatory evidence" (Brief, p. 12), thus violating his constitutional right to due process of law, and that the conduct of a government agent in this respect was so "outrageous" that "the indictment should have been dismissed" (Brief, p. 15). The word "outrageous" appears to have been taken by John from a Supreme Court opinion speculating that "some day" it might be presented with a situation where the conduct of government agents was "so outrageous" as to bar the government from judicial processes to obtain a conviction, but that the situation then before the Court was "distinctly not of that breed." *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973).

This argument for John is that two government witnesses against him, Jacqueline Nowell and Paul Smart, agreed in a plea bargain with the government to surrender to the government all their profits from the illegal marijuana business; to plead guilty to some offenses; and to testify for the government; and that they did not surrender all their illegal profits but instead buried substantial amounts of currency under the porch of a house at Eagle Lake, Maine, owned by Blanche Vaillancourt. Nowell was the wife of Robert Vaillancourt, who also pleaded guilty to a marijuana charge and cooperated with the government; Robert Vaillancourt was the brother of Smart, and Blanche, their mother, was the owner of the house in Maine, under the porch of which it was thought by John that money profits of the drug business had been buried. The argument rests on the claim that Hoyt, a government agent, had interfered with efforts by counsel for John and a private investigator to search for and, if found, to dig up the money supposedly buried in Maine. The brief for John asserts (p. 13): "... the existence of these hidden monies would have been a devastating blow to the credibility of Nowell and Smart and could very well have persuaded the jury that they were totally unworthy of belief."

### 2(b)

At the trial, counsel for John presented testimony of Frank Monico, a private investigator, as to a trip he made to the home of Blanche Vaillancourt in Eagle Lake, Maine, on October 7, 1984, to obtain information as to any monies buried under the porch of her home (T3050–65). After full discussion with counsel, the trial judge sustained an objection by the government that the testimony was irrelevant. The judge struck out the testimony and instructed the jury that it was "to be stricken from your minds and totally disregarded by you" (T3092). Counsel for John had argued that "the relevance is clearly on the issue of credibility" (T3085). The trial judge ruled (T3085): "That makes it collateral, I think." The judge evidently had in mind Federal Rule of Evidence 608(b), under which specific instances of conduct of a witness, for the purpose of attacking credibility, may not be proved by extrinsic evidence. Rule 608(b) is, of course, designed to avoid jury distraction and confusion through the trial of collateral matters on the excuse of an impeachment purpose.

### 2(c)

After the guilty verdict against John had been returned by the jury, a motion was filed on October 24, 1984 for John and a co-defendant Randall, represented by the same counsel, that the charges against

them in the superseding indictment "be dismissed on the grounds that they have been denied due process of law ..." (SA69). From the evidence presented at the hearing of this motion below, and from the Brief of John to this Court (p. 15), it appears that the claim of due process denial to John is based on allegations that government agent Hoyt, by "outrageous" conduct, prevented John from securing evidence at Eagle Lake, Maine, that money profits from the illegal drug traffic had been buried there.

The motion to dismiss the indictment because of the claimed outrageous conduct of Agent Hoyt was heard on October 24, 1984. As we understand the record, the significant evidence in summary showed the following.

Eagle Lake is a small town in the extreme northern part of Maine, very close to the borders of the Canadian provinces of Quebec and New Brunswick. Blanche Vaillancourt, an elderly lady, whose first language seems to be French and whose command of English appears to be limited (her daughter spoke to her in French) (T3403), lives there in a house which she owns; her daughter, Barbara Vaillancourt, lives with her there; she also has a son, Paul Smart, who lives in Connecticut; she also has a son, Robert Vaillancourt, who lives in Connecticut with his wife, Jacqueline Nowell. Nowell, Smart and Robert Vaillancourt were at all relevant times cooperating with the government under plea bargain agreements.

After Nowell and Smart had testified for the government, counsel for John, with the help of Monico, a private investigator, hoped to attack their credibility by showing that they had buried money under the porch of Blanche Vaillancourt's house in Maine.

On Thursday, October 4, 1984, counsel for John asked the trial judge to extend the limits of John's bail bond to permit him to go to and from Maine in company with counsel when the trial was in recess; the application was granted (T2431–32).

On Sunday, October 7, counsel for John, John and Monico (private investigator) appeared without any prior notice at 7:30 to 8 p.m. at the house of Blanche in Maine. They spoke to her only, not to her daughter. They said they wanted to search her house and did so. They said that they wanted to come back in the morning to look under the porch, and that they believed "there was something buried under the porch" (T3410–11). They showed her no identification and did not tell her that her sons were having problems with the drug laws (T3418–19). Monico claimed in his testimony that Blanche consented (T3420).

Evidently, Barbara, the daughter, received a report from her mother that evening; either she, or her mother, or both, telephoned her brothers. On the same evening, Robert Vaillancourt asked the DEA office in Hartford to have Hoyt telephone him. Hoyt did so, and was told by Robert that three men had come to his mother's house in Maine that evening after dark and had told her they were there from the Court in Connecticut to search her house for drug money; that his mother was "very upset" and did not know "what was going on" (T3375). Robert said "he wanted to know who was at his mother's house and what they were doing there" (T3376). Hoyt also talked to Smart that evening on the same subject; both Smart and Robert denied that any money was under their mother's porch (T3380). Hoyt on the same evening (October 7) telephoned the State Police Barracks at Houlton, Maine and asked that a trooper "go to Eagle Lake and find out what was happening to the Vaillancourt house" (T3385); he seems to have talked to "the dispatcher" (T3385).

The next morning (Monday, October 8), John, his counsel, and Monico returned about 8:15 to the house of Blanche to dig under the porch. Barbara, the daughter, came out on to the porch, and with accusations and threats ordered them "to leave the property"; after two or three minutes they left (T3403). Blanche, the mother, could be seen and heard speaking French with Barbara, but she did not speak to the three men (T3403–04).

At about the same time on October 8, the State Police Barracks at Houlton telephoned Trooper Madore in or near Eagle Lake to make contact with Barbara Vaillancourt about a trespass at her residence. Madore telephoned Barbara who wanted three men arrested for criminal trespass; she said they had been to the house that morning but had left and that they had been there the night before (T3336–37).

Trooper Madore then went to the "Fort Plaistead Police Department" and there met John, his counsel, and Monico, who were looking for him to complain that "they had been threatened" at the Vaillancourt home and to obtain help in digging for the supposed buried money. They identified themselves and explained their purpose (T3338–42). They explained the situation. Madore then asked the advice by telephone of Maine Assistant District Attorney Adams, who told Madore that "he was unsure and to contact the complaint justice about it" (T3342). Madore telephoned Complaint Justice Lithicum at her office at Presque Isle, some sixty miles away, and explained the situation; she told them to come to her office. They then flew in a plane from the airport at Frenchville, not far from Eagle Lake, to Presque Isle. They went to Justice Lithicum's office, and Madore applied for a search warrant for the Blanche Vaillancourt property. While at the Lithicum office, Madore received a telephone call from Trooper Caron at Houlton who said that he had learned that Hoyt had advised that "possibly one person [of the three] had no right to be in Maine" (T3346). Madore then asked counsel if John was properly in Maine and was told he was properly there. Nothing of this appears to have been told to the Complaint Justice.

Counsel for John spoke with the Justice and submitted an affidavit of John. After she heard and read everything presented, Justice Lithicum declined to issue a search warrant; "she said she'd not issue a warrant"; "she was having a problem with the jurisdiction, where all this occurred"; "she said there appeared to be sufficient probable cause. However, she did not feel comfortable with it as a jurisdiction problem." (T3342–44). No search warrant was issued, and the group flew back to the airport at Frenchville. Madore then at the airport put counsel for John in touch by telephone with Trooper McMaster (T3355), to whom Madore at that point turned over the matter. McMaster was the Maine State Police "drugman" (T3346).

McMaster discussed the matter thoroughly with counsel for John, who was pressing for a search of and digging at the Vaillancourt home. McMaster had had no earlier contact with the matter and had not spoken to Hoyt or to anyone else in DEA. After speaking with counsel for John and receiving all the information given, McMaster telephoned Coniff, DEA agent in Portland, Maine, and asked Coniff to have Hoyt telephone him (McMaster). Hoyt did so that evening (October 8) and answered all the questions McMaster asked. One of these was whether any money was buried at the Vaillancourt home. Hoyt told him that he (Hoyt) was satisfied that Robert had disclosed all of his assets and that no monies of his were available anywhere. Hoyt also said that if McMaster wanted the home searched, Robert was willing to come up and dig under the porch for him; McMaster replied that "based on the information I have, I don't want it searched" (T3368; 3363–68). McMaster testified (T3366) that he took the information counsel for John had given him and "I conducted my own independent investigation of that information and I come to the conclusion that I didn't believe it was probable cause to believe the money was there and I didn't pursue it further." McMaster testified that he saw no evidence that Nowell or Smart had buried money under the porch (T3372).

The foregoing is the extent of the evidence of "outrageous" conduct by the government, Hoyt being the only government agent involved.

The trial judge at the conclusion of the evidence denied the motion on the ground that there had been "an utter failure of

proof by either or both of the defendants on the motion to [dismiss] the indictment based on outrageous Government conduct" (T3437). Earlier, the trial judge had ruled that even if evidence had been discovered that monies were buried in Maine, such evidence would be inadmissible under the rule against collateral impeachment. The judge asked (T3435): "What else is it except collateral evidence to impeach?" The judge noted that for the same reason, as earlier explained herein, he had struck at the trial the testimony of Monico (T3433).

#### 2(d)

We agree with the trial judge that the conduct of Agent Hoyt is not shown to have been "outrageous." He did not interfere with the efforts in Maine on behalf of John. Hoyt did not go to Maine nor send others there. He made one telephone call on his own initiative, that on Sunday evening, October 7, 1984, to the dispatcher at the Maine State Police Barracks at Houlton, Maine. This telephone call was to ask that a State police officer go to Eagle Lake and find out what was happening at the Vaillancourt home. Hoyt made a second telephone call on the evening of Monday, October 8 to Trooper McMaster, the "drugman" of the Maine State Police. This second call was not at the initiative of Hoyt; on the contrary, it was in response to a request of McMaster, a Maine officer, who was making his own investigation. Hoyt answered questions of McMaster. It is true that in the course of his answering, he expressed an opinion of counsel for John, which was unflattering and obscene, but this is far from outrageous conduct which would bar a prosecution by the government.

There is not the slightest evidence to show that the refusal of the Complaint Justice (with whom Hoyt had no contact whatever) to issue a search warrant, and the failure of the Maine State Police to determine whether monies had been buried under the Blanche Vaillancourt porch, were caused by Hoyt.

#### 2(e)

Nothing done by the government through Hoyt violated John's right to due process, to a fair trial, to present a defense, or to the effective assistance of counsel. We find no error in the ruling of the trial judge denying his motion after trial to dismiss the indictment.

### D. *The Appeal of Thomas Ciccaglione*

Appellant Thomas was found guilty by the jury on count twenty-one, possession in 1980 with intent to distribute marijuana, a Schedule I controlled substance (21 U.S.C. § 841(a)(1)); he was found not guilty on count eighteen, conspiracy to distribute and to possess with intent to distribute marijuana (21 U.S.C. § 846). These two were the only counts in which he was named.

Counsel for appellant Thomas make two arguments for reversal of his conviction on count twenty-one.

#### 1(a)

The first argument for appellant Thomas (Brief, pp. 6–14) is that the government was erroneously permitted to present evidence of a sale of marijuana to Thomas in 1981, whereas he was charged in count twenty-one with possession of marijuana with intent etc. in the fall of 1980, after September 24, 1980. This is said to have "amended the indictment" (Brief for Thomas, p. 7) and to have created "an impermissible variance of the indictment" (Brief, p. 8).

#### 1(b)

A government witness, Nowell, testified on September 25, 1984, that in September 1980 she sold about 300 pounds of marijuana "to him from Southwick" (T1029). She further testified that she didn't know the last name of "him," but it was Italian and he was in the courtroom. She then identified "him" in the courtroom as appellant Thomas (T1030). Nowell also testified without objection that a 28,000 pound load of marijuana was imported into Connecticut in 1981 (T1042), of which she and her husband, Robert Vaillancourt, sold about

14,000 pounds (T1097), of which three or four hundred pounds were sold "to Tom from Southwick [Massachusetts, just north of the Connecticut line]" (T1049). On cross-examination by counsel for Thomas (T1324–90), it was established that the witness knew Thomas very well, had known him since 1978, that he had at her invitation several times been in her home for meals together (T1377), that they played tennis together, and that she had been his guest for two days at a home rented by him on Cape Cod (T1377–78). She was also cross-examined on September 26, 1984, about her testimony of a sale to Thomas in 1981 (T1378–81). On redirect examination, the government, without objection, questioned Nowell about her testimony as to sales to Thomas in 1981 (T1452–53). Not only were there no objections to testimony of the witness Nowell to a sale of marijuana to Thomas in 1981, but there was no motion at the time to strike her testimony.

Our search of the record indicates that the first time any motion was made to strike the testimony of Nowell as to a 1981 sale to Thomas was after the government had rested its case on October 10, 1984. Among a number of motions then made for various defendants was a motion for appellant Thomas "to strike the testimony that was elicited from Ms. Nowell on redirect ... as regards any involvement by my client in 1981" (T2912). (It may be noted that Nowell did not first testify to involvement by Thomas in 1981, on her redirect; she had so testified on direct and on cross, as already shown.) Counsel for Thomas then stated that he would like to "renew" his motion, but no earlier such motion has been found. In any event, after argument, the motion was denied (T2915). It is also argued for Thomas (Brief, p. 7) that the trial judge erroneously refused to "give limiting instructions to the jury" as to the Nowell testimony of a 1981 sale to Thomas. We are unable to verify this in the transcript because at the page cited (3169) there is reference only to a "request three" and there are no requests of Thomas contained in the record. We will assume, however, that a limiting instruction was in fact refused.

### 1(c)

The argument for Thomas that a sale in 1981 was not charged in the indictment and that, therefore, no evidence of such a sale was admissible, is entirely unfounded. Thomas was charged in count eighteen with conspiracy to possess with intent to distribute, and to distribute, marijuana in violation of 21 U.S.C. § 846. The conspirators were named and included many persons other than Thomas and also others not named but "to the grand jury known and unknown." These would include Nowell, who was "known to the grand jury" because she testified before it. The period of the conspiracy was alleged (A170) to have been from about January 1, 1976 to March 1984—a period including 1981. Evidence of a sale to Thomas in 1981 was clearly admissible to show an operation of the conspiracy by two or more of the conspirators. True, the 1981 sale to Thomas was not alleged as an overt act in furtherance of the conspiracy, and the 1980 sale was so alleged, but this means nothing. There is no requirement of an overt act in 21 U.S.C. § 846—unlike 18 U.S.C. § 371, the general conspiracy statute—and this Court has held that in a prosecution under 21 U.S.C. § 846 no overt act need be alleged or proved, *United States v. Bermudez*, 526 F.2d 89, 94 (2d Cir.1975), *cert. denied*, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976).

We are unable to accept the argument for Thomas that evidence of the 1981 sale amended the indictment as to him or was an attempt to prove an offense not charged in the indictment, or was a "variance" of the indictment.

### 2(a)

■ The second argument for appellant Thomas is that there was "outrageous conduct of the office of the United States Attorney in showing the only witness against Ciccaglione where he sat at the defense table immediately prior to the in-court identification testimony by that witness" (Brief, p. 14). The characterization "outrageous" was apparently (as with ap-

pellant John) also taken from *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973). On the basis of such "outrageous" misconduct, counsel for Thomas assert that "he should be granted a new trial" (Brief, p. 19).

### 2(b)

During the direct testimony of Nowell, she identified Thomas in the courtroom by pointing him out, without any hesitation, to the jury (T1029). Without any objection from counsel for Thomas, the Court ordered that the record reflect a correct identification by the witness of Thomas (T1030). There was no question whatever by anybody at the time that the witness properly and correctly identified Thomas.

In the cross-examination of Nowell by counsel for Thomas, she testified that the evening before she testified, "they" (the office of the United States Attorney) "tried to familiarize [her] with the courtroom" (T1373–74). They "told me where certain attorneys and their clients sat" (T1374) including Thomas and his attorney, because they "expected who was going to cross-examine me" (T1374), but all she knew was they were "on that side" (T1375).

### 2(c)

No motion was made at trial for Thomas in respect to his in-court identification by Nowell, but her identification of other defendants was challenged by their counsel (T1375–76, 1385). At the beginning of the trial, the Court permitted any defendant to avail of an objection by any other defendant (T110). We are, therefore, prepared to consider the point, but failure to raise it at the trial certainly creates doubt as to its merit.

It was abundantly clear from the evidence that Nowell had known Thomas for some years, whether or not she remembered his last name, and could easily identify him. She testified that she had known Thomas since 1978 (T1030), that she remembered his telephone number and recited it from the stand (T1030), that he came two or three times in 1980 to her home in Marlborough to pick up marijuana, that he drove a Volvo (T1031), that she and her husband delivered marijuana in 1981 to the house of Thomas in Southwick (T1508), that she played tennis with Thomas, that she invited him to her home for dinner, and that she was a guest for two days in his house on Cape Cod (T1377).

### 2(d)

The brief for appellant Thomas insists (p. 6) that "the Government's *only* witness against Ciccaglione" (emphasis in original) was Nowell. This would appear to represent that Nowell was the only witness who showed any connection of Thomas with the subject marijuana transactions. This is not in keeping with the record. It appears that a witness for the government, Paul Smart, was a participant in the criminal conduct charged in the superseding indictment who made a plea bargain with the government. During his testimony, he was asked whether he could identify anyone in the courtroom who participated in the events of the marijuana conspiracies to which he testified. He at once identified two persons, one of whom was appellant Thomas (T2003–04). Smart, a brother of Robert Vaillancourt (the husband of Nowell), testified that Thomas was seen by him at least twice at his house where Thomas was "talking with Bob [Vaillancourt] and Jackie [Nowell]" and that Thomas "picked up some dope."

We find in the record, therefore, no justification for the assertion for Thomas (Brief, p. 15) that Nowell's "in-court identification was the sole substantial incriminating testimony against Ciccaglione."

### 2(e)

We conclude that there is no proof in the record of any "outrageous" conduct by the government in respect of Thomas and that in all respects he received a fair trial.

### 3(a)

In his reply brief, Thomas adopts the arguments of appellant LaChance on the issue of whether the district court erred in denying, without a hearing, the motion of LaChance and Zimmerli "to Dismiss for

Failure to Comply with the Law in the Selection of Grand Jurors" (Reply Brief, p. 2). We have already concluded (section A of opinion) that Chief Judge Daly properly denied that motion.

### 3(b)

Thomas also adopts in his reply brief the arguments of appellant John on the issue of the district court's denial of the "Motion to Strike the Petit Jury Panel and to Summon New Veniremen" (Reply Brief, p. 2). We have concluded above (section C of opinion) that this argument is without merit.

The judgments, from which these four appeals are taken, are each AFFIRMED.