[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a petition of writ of habeas corpus in which the petitioner claims he is illegally confined for the following reasons:
 First Count: The petitioner's right to equal protection of the law under the United States Constitution, Amendment XIV, was violated in that the petitioner, a black male, was indicted by a grand jury drawn from an array on which members of his race were substantially underrepresented as a result of the selection procedure used by the high sheriff to summon persons for grand jury service.
 Second Count: The petitioner's right to the effective assistance of counsel under the United States Constitution, Amendments VI and XIV, was violated in that his trial counsel failed to investigate adequately and inform him of the viability of a constitutional challenge to the racial composition of the array from which his grand jury was selected.
 Third Count: The petitioner's right to equal protection of the law under the Connecticut Constitution, Article First, Section XX, was violated in that the petitioner, a black male, was indicted by a grand jury drawn from an array of which members of his race were substantially underrepresented as a result of the selection procedure used by the high sheriff to summon persons for grand jury service.
 Fourth Count: The petitioner's right to the effective assistance of counsel under the Connecticut Constitution, Article First, Section Eight, was violated in that his trial counsel failed to investigate CT Page 1921 adequately and inform him of the viability of a constitutional challenge to the racial composition of the array from which his grand jury was selected.
PROCEDURAL HISTORY
On August 19, 1981, the Petitioner was indicted and charged by a grand jury in the Judicial District of New Haven with the crime of murder, a violation of General Statutes Section 53a-54a. On November 16, 1982, a jury of twelve found him guilty as charged. Final judgment was rendered on December 19, 1982, when the trial court, Hadden, J., sentenced him to thirty years imprisonment.
BURDEN OF PROOF
In a habeas corpus petition, the petitioner has the burden of proof of establishing the underlying facts that form the basis of the claimed violations by a fair preponderance of the evidence. Arey v. Warden, 187 Conn. 324, 331 (1982); Blue v. Robinson, 173 Conn. 360, 370 (1977).
RESPONDENT'S CLAIMS
The Respondent raises the following claims in arguing that the Court should not reach the merits of the Petitioner's grand jury equal protection claim: (1) the Respondent claims that the "cause and prejudice" standard, rather than the "bypass standard," should be used to justify the Petitioner's failure to pursue a timely challenge to the grand jury array.
 I. THE RESPONDENT CLAIMS THAT THE "CAUSE AND PREJUDICE STANDARD", RATHER THAN THE "BYPASS STANDARD," SHOULD BE USED TO JUSTIFY THE PETITIONER'S FAILURE TO PURSUE HIS GRAND JURY EQUAL PROTECTION CLAIM ON DIRECT APPEAL
The threshold issue is whether the deliberate bypass test as claimed by the Petitioner or the cause and prejudice test as claimed by the Respondent is the standard to apply regarding the Petitioner's failure to raise the present issues on direct appeal.
Both the deliberate bypass test and the cause and prejudice test have to do with the circumstances under which a court will allow habeas corpus review of a constitutional claim that was not raised on direct appeal. The deliberate bypass rule was first established in Fay v. Noia, 372 U.S. 371, CT Page 19229 L.Ed.2d 837, 83 S.Ct. 822 (1963).
In establishing the bypass rule, the Fay court, at pages 438-439, stated in part as follows:
 We therefore hold that the federal habeas judge may in his discretion deny relief to an applicant who has deliberately bypassed the orderly procedure of the state courts and in so doing has forfeited his state court remedies. But we wish to make very clear that this grant of discretion is not to be interpreted as a permission to introduce legal fictions into federal habeas corpus. The classic definitions of waiver enunciated in Johnson v. Zerbst, 304 U.S. 458, 464, 82 L.Ed 1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357 — `an intentional relinquishment or abandonment of an intentional relinquishment or abandonment of a known right or privilege' furnishes the controlling standard. If a habeas corpus applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forwent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate bypassing of state procedures, then it is open to the federal court on habeas to deny him all relief if the state courts refused to entertain his federal claims on the merits — though of course only after the federal court has satisfied itself, by holding a hearing or by some other means, of the facts bearing upon the applicant's default. . . . At all events we wish it clearly understood that the standard here put forth depends on the considered choice of the petitioner. . . . A choice made by counsel not participated in by the petitioner does not automatically bar relief."
The Fay standard was first adopted by our Connecticut courts in Vena v. Warden, 154 Conn. 363, 366-67,225 A.2d 802 (1986) where the court, at pages 365, 366 and CT Page 1923 367, stated in part as follows:
 Our cases have enunciated the general proposition that habeas corpus cannot be used as an alternative to an appeal. . . . (a)n exception to this limitation should be made when the conviction which gave rise to the challenged detention was obtained in violation of the petitioner's rights under the federal constitution. . . . This exception is in complete harmony with the statutory directive to the court or judge on the habeas corpus proceeding to `dispose of the case as law and justice require.' General Statutes Sec. 52-470.
 It is for the trial court to determine the circumstances under which a judgment may be attacked collaterally on federal constitutional grounds under General Statutes Secs. 52-466 — 52-470 and whether the petitioner, by having failed to assert these claims in accordance with our rules of procedure, has forfeited his right to raise them in a habeas corpus proceeding. . . . In making this determination, the trial court has `the obligation to guard, enforce, and protect every right granted or secured by the Constitution of the United States.'
 We are not compelled, of course, to conform our postconviction procedure to that of the federal jurisdiction. But we reiterate our adherence to our policy which has allowed federal constitution arising out of state court convictions to be presented and determined in our courts . . . We hold, therefore, that a petitioner may collaterally raise federal constitutional claims in a habeas corpus proceeding even though he has failed to appeal his federal constitutional claims directly to us if he alleges and proves, by a fair preponderance of the evidence, facts which will establish that he did not deliberately bypass the orderly procedure of a direct appeal. To be more precise, he must both allege in his petition and prove at the habeas corpus hearing that he did CT Page 1924 not `after consultation with competent counsel or otherwise, understandingly and knowingly. . . .(forego) the privilege of seeking to vindicate his federal claims' by a direct appeal to this court. . . . The burden of alleging and proving such facts is rightfully on the petitioner. . . . The determination whether a prisoner has deliberately bypassed the orderly procedure of an appeal must be made from the facts in each case. (emphasis provided.)
The deliberate bypass standard was lowered as shown in D'Amico v. Manson, 193 Conn. 144, 146-148, 476 A.2d 543
(1984) where the court states in part as follows:
 `(T)he petitioner must allege and prove in the trial court that there has not been a deliberate bypass of the orderly procedure of a direct appeal of this court `. . . This principle has been modified, however, to the extent of requiring that the record before us must disclose some reasonable basis for concluding that a convicted person has intelligently, understandingly and voluntarily waived his statutory right to appeal. . . . Such a person significant protection of liberty as the right to appeal made available to all persons convicted of crimes, must be viewed as fundamental, although its basis is statutory rather than constitutional. . . . A waiver of such a right can be found only where it is clearly established that there has been `an intentional relinquishment or abandonment of a known right or privilege.' (emphasis provided). (citations omitted).
The D'Amico rule first places the burden upon the petitioner to allege that there has not been a deliberate bypass of the orderly procedure of a direct appeal. Once that allegation is made then in the absence of the record disclosing some reasonable basis for concluding that a convicted person has intelligently, understandingly and voluntarily waived his statutory right to appeal the issue in question then such a waiver cannot be found. CT Page 1925
In Valeriano v. Bronson, 209 Conn. 75 (1988), in discussing the deliberate bypass standard and the cause and prejudice standard the Valeriano court stated in part at pages 79-81 as follows:
 The standard by which to evaluate whether a petitioner has deliberately bypassed a direct appeal is whether the record affirmatively discloses that the petitioner's decision to waive his right to appeal was made voluntarily, knowingly and intelligently. . . This court has held that a petitioner has not bypassed his right to appeal in a variety of circumstances. See, e.g. Payne v. Robinson, 207 Conn. 565, 569, 541 A.2d 504
(1988) (Petitioner's Attorney never filed appeal); Paulsen v. Manson, supra, 341 (Petitioner impermissibly denied right to counsel on appeal); D'Amico v. Manson, supra, 149 (Petitioner who pleaded guilty unaware of right to appeal, after guilty plea); Turcio v. Manson, 186 Conn. 1, 4, 439 A.2d 437 (1982). . . . This court has acknowledged the existence of the cause and prejudice test announced in Wainwright v. Sykes. . . and it has also recognized that it is more restrictive than the `deliberate bypass' test that has been adopted by this court . . . . Although the cause and prejudice test is mandated for federal courts and has also received acceptance by state courts, this court has continued to apply the deliberate bypass test of `an intentional relinquishment or abandonment or a known right or privilege' (emphasis provided).
The Valeriano court went on to state at page 85 in adhering to the deliberate bypass test the following:
 We conclude that when a petitioner raises a claim of ineffective assistance of appellate counsel because his attorney did not raise an issue on direct appeal, the deliberate bypass standard should be utilized. We also conclude that any claim invoking ineffective assistance of appellate counsel automatically satisfies the deliberate bypass standard. In State CT Page 1926 v. Leecan, (citations omitted), we decided to permit review of all claims of ineffective assistance of trial counsel in habeas corpus proceedings. In such instances, we assumed the deliberate bypass standard was automatically satisfied. Id. The same posture logically applies to ineffective assistance of appellate counsel claims. Thus, the petitioner has satisfied the deliberate bypass standard to the extent that his ineffective assistance of appellate counsel claim will be addressed. (emphasis provided).
The thrust of the Petitioner's argument in support of the use of the deliberate bypass standard is that all of the decisions rendered by our Connecticut Supreme Court since that standard was initially adopted have continued to apply that standard. The Respondent, on the other hand, claims that the "cause and prejudice" standard is the appropriate standard for determining whether a Petitioner's unpreserved claims should be reviewed by the habeas court and makes the following two arguments in support of that claim: (1) our Supreme Court has not rejected the "cause and prejudice" standard; and (2) the deliberate bypass standard is an inappropriate standard for determining reviewability of claims which were not raised at trial.
The Respondent cites Valeriano v. Bronson, 209 Conn. 75,546 A.2d 1380 (1988), for its argument that while the Supreme Court has not embraced the cause and prejudice standard, it has also not rejected it. The Respondent quotes from footnote 7 in Valeriano as follows:
 We conclude only that the deliberate bypass test applies to ineffective assistance of appellate counsel claims even when the basis for the ineffectiveness is the omission of an issue on appeal . . . We decline to address the conclusion of the Appellate Court that the cause and prejudice test applies to the strategic or tactical determination of whether to include a particular issue on appeal in circumstances other than ineffective assistance of appellate counsel claims. (citations omitted).
From the above language, the Petitioner then argues that our CT Page 1927 Supreme Court is open to the application of the "cause and prejudice" standard where appropriate.
This Court is not persuaded by that argument. The issue is not whether our Supreme Court has rejected the cause and prejudice standard but whether our Supreme Court has rejected the deliberate bypass standard. Until D'Amico is overruled, it is the law of Connecticut. This Court is bound to recognize the existing laws of this state until such time as our Supreme Court or the legislature changes or interprets the existing law differently. Gordon v. Clairol, Inc., 22 Conn. Sup. at 211. The opinions of the Supreme Court of Connecticut are binding upon the Superior Court. Until the rule in D'Amico is reversed, changed or modified by the Supreme Court, this Court must follow it. Montes v. Hartford Hospital, 26 Conn. Sup. 441, 442-443. Finally, this Court is mindful of the admonition found in Hughes v. Bemer, 200 Conn. 400 (1986), where Shea, J. dissenting stated at page 405 as follows:
 This procedural delict of the plaintiffs pales to insignificance by comparison with the substantive error of the trial court in failing to adhere to a controlling precedent established by a recent court decision of this court.
Hughes v. Bemer, 200 Conn. 400, 405 (1986) (Shea, J., dissenting).
This Court therefore concludes that the claimed failure of our Supreme Court to reject the "cause and prejudice" standard is not the test to determine whether the deliberate bypass standard should continue to be applied. The test to determine whether the deliberate bypass standard should be continued to be applied is whether that standard has been rejected by our Supreme Court. Since that standard has not been rejected by our Supreme Court, this Court is bound to continue to apply that test.
Unless and until D'Amico and cases that follow it is reversed by our state Supreme Court, the deliberate bypass rule continues to be the standard to determine when a constitutional claim that was not raised at the trial level can be raised in a habeas corpus proceeding.
As stated earlier, Vena holds that "we are not compelled, of course, to conform our post-conviction procedure to that of the federal jurisdiction." Id. at 366. CT Page 1928
FACTS RE UNPRESERVED GRAND JURY CLAIM BYPASS ISSUE
The Petitioner was represented by counsel at the time of his grand jury indictment and his 1982 trial in the Judicial District of New Haven. The Petitioner's trial attorney never filed a challenge to the method by which the Petitioner's grand jury was selected. The Petitioner's trial attorney did not discuss with the Petitioner the possibility of raising a challenge to the racial composition of the Petitioner's grand jury. The Petitioner first became aware of his right to raise such a challenge in 1986. The Petitioner is a Black man. The Petitioner would have wanted to raise a challenge to the racial composition of his grand jury if he had been aware of his right to raise such a challenge.
This Court concludes that there has not been a deliberate bypass of the orderly procedure of direct appeal by the Petitioner of his grand jury claim for the following reason: (1) there is no evidence that the Petitioner knew of the fact that he could raise a grand jury claim on direct appeal.
It is therefore necessary to reach the merits of the Petitioner's grand jury equal protection claim.
II. THE PETITIONER'S EQUAL PROTECTION CLAIM
The Petitioner's equal protection claim arises out of the jury array selection procedure under Connecticut General Statutes Section 51-220.
As shown in State v. Townsend, 167 Conn. 539, 549
(1975), a table based on the provisions of the then existing Section 51-220 would be as follows:
 PERCENTAGE OF SIZE OF TOWN JURORS POPULATION
 0 — 1500 30 2.0% 1500 — 2500 56 2.24 — 3.73% 2500 — 5000 90 1.80 — 3.60% 5000 — 10000 120 1.20 — 2.40% 10000 — 25000 225 .90 — 2.25% 25000 — 50000 337 .67 — 1.38% 50000 — 100000 675 .675 — 1.37% over — 100000 1012 1.012%
The Respondent has admitted that the Petitioner is Black; he is a member of a cognizable group; Blacks constitute a distinct group in the community and the Petitioner was CT Page 1929 indicted by a grand jury drawn from an array comprised of individuals summoned substantially pursuant to Connecticut General Statutes Section 51-220.
The Petitioner relies on the statistical decision theory (hereinafter referred to as "SDT") in support of his equal protection claim and fair cross section claim. The Respondent relies on three statistical approaches in opposition to the Petitioner's claims, namely, absolute disparity, comparative disparity, and the substantial impact test. In addition, the Respondent claims that the Petitioner has improperly used the statistical decision theory.
The Petitioner claims that the jury array selection procedure mandated by General Statutes Section 51-220 was not racially neutral and resulted in substantial underrepresentation of members of Petitioner's race, in violation of the equal protection clauses of the federal and/or state constitutions.
The jury array need not mirror the sociological composition of the community. Swain v. Alabama, 380 U.S. 202,208, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); State v. Castonguay,194 Conn. 416, 425-26 (1984).
The equal protection clause of the federal constitution is found in Amendment XIV, Section 1 and reads as follows:
 All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any persons of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.
The equal protection clause found in the Connecticut Constitution in Article I, Section 20, as amended by Article V reads as follows:
 No person shall be denied equal protection of the law nor be subjected to segregation or discrimination in the enjoyment of his or her civil or political CT Page 1930 rights because of religion, race, color, ancestry, nationality or sex.
Any claim of an equal protection violation must start with an analysis of Castaneda v. Partida, 430 U.S. 482,51 L.Ed.2d 498, 97 S.Ct. 1272 (1977).
Castaneda established the three prong test required to show an equal protection violation when the court stated in part at page 494 as follows:
 Thus, in order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. . . . Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. . . . This method, of proof, sometimes called `rule of exclusion,' has been held to be available as a method of proving discrimination in jury selection against a delineated class. . . . Finally, as noted above, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. . . . Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case.
The Castaneda court cited with approval the language from Washington v. Davis, 426 U.S. 229, 48 L.Ed.2d 597,96 S.Ct. 2040 (1976) that:
 With a prima facie case made out, `the burden of proof shifts to the State to rebut the presumption of CT Page 1931 unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result.' Castaneda at 430 U.S. 494.
 1. THE FIRST PRONG UNDER CASTANEDA IS TO ESTABLISH THAT THE GROUP IS ONE THAT IS A RECOGNIZABLE, DISTINCT CLASS, SINGLED OUT FOR DIFFERENT TREATMENT UNDER THE LAWS, AS WRITTEN OR AS APPLIED
The Respondent does not contest the fact that the Petitioner is Black and can satisfy the first prong of the Castaneda analysis as a member of a recognizable, distinct group. See Carter v. Jury Commissioner, 396 U.S. 320,90 S.Ct. 518, 24 L.Ed.2d 549 (1970); Hernandez v. Texas, 347 U.S. 475,478-79, 74 S.Ct. 667, 98 L.Ed.2d 866 (1954).
 2. THE SECOND PRONG UNDER CASTANEDA IS THAT THE DEGREE OF UNDERREPRESENTATION MUST BE PROVED, BY COMPARING THE PROPORTION OF THE GROUP IN THE TOTAL POPULATION TO THE PORTION CALLED TO SERVE AS JURORS, OVER A SIGNIFICANT PERIOD OF TIME
In referring to the second prong, the Castaneda court stated that:
 This method of proof, sometimes called the `rule of exclusion,' has been held to be available as a method of proving discrimination in jury selection against a delineated class.
This rule of exclusion was further identified and discussed in Footnote 13 as follows:
 The idea behind the rule of exclusion is not at all complex. If a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process.
The threshold question that must first be determined is whether the statistical decision theory (hereinafter referred to as "SDT"), the absolute disparity theory, the comparative disparity theory or the substantial impact theory CT Page 1932 is the appropriate analysis in an equal protection claim.
Castaneda teaches that in the context of a federal constitutional equal protection claim that the statistical decision theory is the proper analysis to follow to determine whether the degree of the claimed underrepresentation was substantial.
State v. Castonguay described and approved that theory as follows:
 First expounded in 1966; Finkelstein, `The Application of Statistical Decision Theory to the Jury Discrimination Case,' Harv. L. Rev. 338, 349-353 (1966); SDT has gradually become the favored method of the United States Supreme Court in analyzing equal protection challenges to grand jury arrays. . . . (Citations omitted). The import of this method is that it is a highly sophisticated and precise indicator of whether the disparity between the group's representation in the population and the representation among grand jurors is the result of a neutral and random selection process. In the context of a fair cross section claim, however, where the focus is not on intent but rather on whether the array is reasonably representative of the community, SDT is inapposite. (emphasis provided) (Id. 427-428).
This Court concludes that the Petitioner's Equal Protection claim under the federal and state constitution should be analyzed by the SDT and not by the absolute disparity, comparative disparity or substantial impact method as claimed by the Respondent.
Castaneda teaches that in order to meet the second prong of its three prong test that a Petitioner must establish not only that his group was underrepresented, but also that the degree of underrepresentation was substantial. Id. at 493-494, 97 S.Ct. at 1279-1280. A prima facie case of discrimination stems from the concept that if "a disparity is sufficiently large, it is unlikely that it is due solely to chance or accident. . . ." Castaneda, 430 U.S. at 494 n. 13,97 S.Ct. at 1280 n. 13.
a. FACTS RE SHERIFF HEALEY'S GRAND JURY SELECTION SYSTEM CT Page 1933
Sheriff Healey was elected High Sheriff of New Haven County in 1972. Before he assumed the office of High Sheriff, Sheriff Healey served as Chief Deputy Sheriff under then High Sheriff J. Edward Slavin. Mr. Slavin served as High Sheriff from June 1, 1959, until he died in 1972.
Prior to 1983, Sheriff Healey's duties as High Sheriff included the selection of grand jurors. Sheriff Healey was responsible for selecting the grand jurors in all of New Haven County.
Before Sheriff Healey assumed the office of High Sheriff, former High Sheriff J. Edward Slavin was responsible for selecting grand jurors in New Haven County. Sheriff Healey was familiar with the method Sheriff Slavin used to select grand jurors because, as Chief Deputy Sheriff, he would assist him once the grand jurors were selected.
Upon assuming office, he selected grand juries in the same manner utilized by his predecessory, Sheriff Slavin. Sheriff Slavin had summoned persons for grand jury service from lists of names presented to him from various leaders throughout the county. To obtain names of persons different in race, national origin, political affiliation and religious persuasion, both Sheriff Slavin and Sheriff Healey canvassed the county and familiarized themselves with a large number of people. They received many recommendations from clergymen and industrialists.
In compiling grand juries from these lists, neither Sheriff Slavin nor Sheriff Healey were informed of the name of the accused or his race.
In 1977 or 1978, in response to complaints lodged by the defense bar that this selection system was racially discriminatory, Sheriff Healey implemented a new procedure whereby he chose persons for grand jury service directly off the master petit jury array list from the prior court year. This directory was compiled pursuant to Connecticut General Statutes Section 51-220 and contained names of several hundred prospective jurors arranged according to the town of their residence. Sheriff Healey obtained the directory from Nicholas Cimino, Chief Clerk of the New Haven Judicial District and Jury Commissioner for New Haven County.
Commencing 1977 or 1978, Sheriff Healey contacted forty to fifty persons from the entire directory to compile each twenty-member grand jury. In choosing names from the master petit jury array list, Sheriff Healey usually picked every fifth name from the list. He used the entire directory CT Page 1934 until every person had been contacted.
After selecting forty to fifty names, Sheriff Healey mailed grand jury summonses to these people.
b. THE ISSUE OF SIGNIFICANT PERIOD OF TIME
To substantiate his claim of lack underrepresentation, the Petitioner presented demographic and statistical evidence relating to the court years 1979-1980, 1978-1979, 1980-1981, 1974-1975, 1975-1976, and 1976-1977.
This Court concludes that the demographic and statistical evidence presented by the Petitioner covers a significant period of time regarding the Petitioner's grand jury indictment in 1980.
 c. THE ISSUE OF ESTIMATED DATA VERSUS ACTUAL OR OBSERVED DATA
ADDITIONAL FACTS
The procedure followed by the Petitioner to prove the degree of underrepresentation was by comparing the proportion of the group in the total population to the estimated number of persons called to serve as jurors from the group.
Table I is a summary of the statistical evidence presented by the Petitioner.
Table II shows the claimed effect of the town quota system on the representation of Blacks in the jury array.
The tolerable range represents the range of jurors that could be either 95 percent or 99 percent certain to be chosen under a district-wide selection system, rather than the town quota system of 51-220.
TABLE I ____________________________________________________________________________ | | | |Number of | |% of Adult | |Black |% of |Jurors Using |Number |Population Court|Adult |Adult |Blacks |Representation |of Jurors |Adult Year |Popula- |Popula- |in Adult |by Adult |Using Town |Array Town | tion | tion |Population|Population |Quota |Quota | | | | |System |System _____|_________|_________|__________|_______________|___________|__________ | | | | | | CT Page 1935 79-80| 312,894 | 23,422 | 7.49% | 4,697 | 4,697 | 1.50% _____|_________|_________|__________|_______________|___________|__________ | | | | | | 78-79| 312,894 | 23,422 | 7.49% | 4,828 | 4,828 | 1.54% 80-81| | | | | | _____|_________|_________|__________|_______________|___________|__________ | | | | | | 74-75| | | | | | 75-76| 463,351 | 27,613 | 5.96% | 8,405 | 8,405 | 1.81% 76-77| | | | | | _____|_________|_________|__________|_______________|___________|__________
TABLE II ________________________________________________________________ | | Expected | Probability | Likelihood | | Estimated | Number | of Expected | of Blacks | Court | Number of | of | Number (24) | being | Year | Blacks in | Blacks | or fewer | selected | | Representative | in array | Blacks in | Under Town | | Array | using | Array if | Quota | | | Town | Selection | System | | | Quota | was by | | | | System | Representation | | ______|________________|__________|________________|____________| | | | 1 in 16 | | 79-80 | 352 | 241 | Billion | 1.03% | ______|________________|__________|________________|____________| 78-79 | | | | | 80-81 | 361 | 267 | 1 in 24 | 1.14% | | | | Million | | ______|________________|__________|________________|____________| 74-75 | | | | | 75-76 | | | | | 76-77 | 501 | 371 | 1 in 4 | 1.34% | | | | Billion | | ______|________________|__________|________________|____________|
TABLE II (cont.)
___________________________________________________________ | Likelihood | Likelihood | 95% | 99% | | of | of | Tolerable | Tolerable | Court | non-Blacks | non-Black | Range | Range | Year | being | being | | | | selected | chosen | | | | Under Town | District-wide | | | | Quota | then | | | | System | a black | | | ______|____________|_______________|___________|___________| 79-80 | 1.54% | 50% | 316-387 | 305-399 | CT Page 1936 ______|____________|_______________|___________|___________| 78-79 | | | | | 80-81 | 1.58% | 38% | 325-397 | 315-408 | ______|____________|_______________|___________|___________| | | | | | 74-75 | | | | | 75-76 | 1.84% | 37% | 458-544 | 445-563 | 76-77 | | | | | ______|____________|_______________|___________|___________|
It is factually true that the population of the New Haven Judicial District for the court year 1979-1980 was 7.49 percent Black. It is also factually true that 7.49 percent of the 4,697 petit jurors summoned would amount to 352 Blacks. It is also factually true that under the town quota system, if the number of Blacks chosen from each town was exactly the percentage of Blacks in each town in relationship to the population of such town then the expected number of Black jurors that would have been called under the town quota system would have been 241.
It is also factually true that under the SDT procedure followed by the Petitioner of attempting to prove the degree of underrepresentation by comparing the proportion of the group in the total population to the estimated number of persons called to serve as jurors from the group that the probability of 241 or fewer Blacks being selected randomly would be one chance in sixteen billion.
It is also factually true that the probability of each town's representation on the array being exactly proportionate to the percentage of Black adults in the town is approximately one in ten billion. As stated earlier, the probability of the expected number (241) or fewer Blacks in the array if selection was by representation of adult population is one in sixteen billion. The 95 percent tolerable range is 316 to 387 and the 99 percent tolerable range is 305 to 399. No testimony was presented regarding the probability of the 95 percent tolerable range of 316 Blacks or fewer in the array if selection was by representation of adult population or of the 99 percent tolerable range of 305 Blacks or fewer Blacks in the array if the selection was by representation of adult population.
The Petitioner argues that since Sheriff Healey selected grand jurors from the petit jury list and since Blacks were underrepresented on the petit jury list, that the Petitioner has therefore met the second prong under Castaneda. CT Page 1937
The Court is not persuaded by that argument.
In arguing that he has met the second prong of Castaneda, the Petitioner relies primarily on Alston v. Lopes,621 F. Sup. 992 (D. Conn. 1985), Aff'd sub. nom., Alston v. Manson and Haskins v. Manson, 791 F.2d 255 (2nd. Cir. 1986), Cert. denied 479 U.S. 1084 (1987). The District Court decision will hereafter be referred to as Alston and the Second Circuit decision will hereafter be referred to as Alston/Haskins. It is true that Alston and Alston/Haskins involved the working of Connecticut General Statutes Section 51-220. It is also true that the Petitioner in this case in an attempt to satisfy the second prong of Castaneda to demonstrate that the exclusion of Blacks from his jury array was "substantial" relied upon a probability analysis and methodology similar to that used in Alston. There is, however, a critical distinction between the Alston and Alston/Haskins case and the present case. The court in Alston stated in part at page 996-997 as follows:
 The State does not challenge the accuracy or propriety of these statistics . . . . According to the State, Blacks register to vote in smaller proportion then do Whites, the underrepresentation can be explained on grounds apart from the statute.
Thus in Alston, the State did not challenge the method used by the Petitioner in arriving at his statistics. The majority of the court in Alston/Haskins accepted the statistical findings and then applied the law to those findings. In the present case, the Respondent does challenge whether it is proper to use an estimated number of jurors in arriving at a statistical decision theory conclusion. Other than the Alston and Alston/Haskins decisions, all parties are in agreement there is no other reported decision that involves the use of estimated numbers as opposed to actual or observed numbers in determining whether a substantial disparity existed.
The Court is not persuaded that the Petitioner has met the second prong of Castaneda of proving a substantial degree of underrepresentation.
The second prong of Castaneda compares the proportion of the group in the total population to the proportion called to serve. In discussing the second prong, the Castaneda court in note 17 stated in part as follows:
As a general rule for such large CT Page 1938 samples, if the difference between the expected value and the observed number is greater than 2 or 3 standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist. (emphasis provided)
Castaneda involved a challenge to the grand jury selection procedure. The evidence showed that the population of the county was 79.1 percent Mexican-American, but that, over an 11-year period, only 39 percent of persons summoned for grand jury service were Mexican-American. The Castaneda court, at page 497, stated in part as follows:
 The mathematical disparities that have been accepted by this Court as adequate for a prima facie case have all been within the range presented here. For example, in Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967), the number of Negroes listed on the tax digest amounted to 27.1% of the taxpayers, but only 9.1% of those on the grand jury venire. The disparity was held to be sufficient to make out a prima facie case of discrimination. See Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634
(1967) (24.4% of tax lists, 4.7% of grand jury lists); Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967) (19.7% of tax lists, 5% of jury list).
In each case cited with approval in Castaneda, the number and percentage of Blacks called to serve on either the petit or grand jury was an actual number or percentage as opposed to an estimated number or percentage. The requirement of showing observed data as opposed to estimated data in a statistical decision theory analysis was also established in State v. Villafane, 164 Conn. 637, 648 (1973), where the court stated in part as follows:
 In the present case such striking underrepresentation was not argued and the court properly heard evidence by a mathematician who attempted to prove that the selection process was discriminatory on the basis of a methodology known as statistical decision theory. This approach evaluates results expected to be produced by a random selection and compares these CT Page 1939 expected results with the observed data of actual selections to determine whether such actual results are consistent with randomness. (emphasis provided)
The Castaneda court cited with approval, "The Application of Statistical Decision Theory to the Jury Discrimination Cases." Article by Michael O. Finkelstein. That article was written to explore the applicability of the branch of mathematics known as statistical decision theory to cases involving claims of discrimination in the selection of jurors. In that article, found in Vol. 80, Harvard Law Review 338, the author states in part at page 352 as follows:
 . . . it is possible, at least in the case of venires and grand juries, to determine whether the number of Negroes selected, which I shall call the distribution of Negroes, is consistent with randomness. . . . Statistical decision theory provides a measure of the extent to which a given distribution differs from the theoretical or expected random distribution and a test of the significance of such difference. The test will indicate, within mathematically determined limits of accuracy, whether the nature of the observed distribution is so at variance with the expected distribution that the hypothesis of random selection ought to be rejected. (emphasis provided)
The attempted SDT test provided by the Petitioner measured the extent to which a theoretical or expected distribution differs from the theoretical or expected random distribution. It does not measure the extent to which a given distribution differs from a theoretical or expected random distribution. The significance of the difference between the two distributions (given versus expected random) is to test whether the nature of the observed distribution is so at variance with the expected distribution, not to test whether the nature of the expected distribution differs from the expected random distribution. The hypothesis of random selection cannot be tested unless there is an observed distribution. In this case, the Petitioner failed to present evidence of an observed distribution. This Court concludes that based on Castaneda note 17, Villafane, and further based on Finkelstein that the SDT cannot be used to prove substantial underrepresentation in jury selection unless there is an observed distribution. CT Page 1940
In addition to the lack of any evidence as to the actual number of Blacks called to serve on the Petitioner's jury array, there is a second fatal flaw in the statistics presented by the Petitioner. Castaneda held in part at430 U.S. 497, note 17, as follows:
 The observed number is three hundred thirty-nine. Of course, in any given drawing some fluctuation from the expected number is predicted. The important point, however, is that the statistical model shows that the results of a random drawing are likely to fall in the vicinity of the expected value. . . . The measure of the predicted fluctuations from the expected value is the standard deviation, defined for the binomial distribution as the square root of the product of the total number of the sample (here 870) times the probability of selecting a mexican-american (0.79) times the probability of selecting a non-mexican-american (0.209). Id. at 213. Thus, in this case, the standard deviation is approximately 12. As a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist. (emphasis provided)
Thus, Castaneda teaches that it is not sufficient to simply show that there is a difference between the expected value and the observed value. Rather, it is important to determine whether the observed number is greater than two or three standard deviations. Even if it is to be assumed that it is proper to substitute an estimated number for an observed number, it would still be required to do statistical decision theory analysis on the basis of two or three standard deviations. A standard deviation analysis was not presented to the Court during the trial of the Petitioner's case.
A standard deviation analysis was required in United States v. LaChance, 788 F.2d 856 (1986) (2nd Cir.). In LaChance, a fair cross section claim, the petitioner attempted to satisfy the second prong of Duren by using an SDT analysis, including showing the number of standard deviations from the expected number. The LaChance court did not rule on the CT Page 1941 petitioner's argument that the second prong of the Duren test (group representation in jury venires not "fair and reasonable") is satisfied by an SDT analysis as opposed to the Jenkins requirement of using the substantial impact theory.
The LaChance court did, however, cite with approval the Castaneda requirement, ". . . that as a general rule for such large samples (870) if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." LaChance at 866-67.
The Petitioner also cites Villafane v. Manson,504 F. Sup. 78 (1980). Villafane differs from the present case in that in Villafane, both parties agreed as to the accuracy of the numbers and statistics involved to the extent that between 1963 and 1971, 738 grand jurors were chosen from the sheriff's list and 41 eighteen-person grand juries were empanelled. Further in Villafane, of the 738 grand jurors who were selected during this period, only two were Puerto Rican. Thirty-nine grand juries had no Puerto Ricans and two had one Puerto Rican juror each.
In the present case, no testimony was presented as to the number of grand jurors who were chosen between 1974 and 1981. Further, no testimony was presented as to the number of grand jurors between 1974 and 1981 who were Black. In addition, no testimony was presented as to the number of grand juries that had no Blacks and the specific number of Blacks that were on each grand jury that was chosen.
This Court concludes that the Petitioner has failed to make out a prima facie case in that he has failed to establish that his group was underrepresented and he has also failed to establish that the degree of underrepresentation was substantial. Castaneda, id. at 493-94, 97 S.Ct. at 1279-1280.
 3. THE THIRD PRONG UNDER CASTANEDA IS THAT THE SELECTION PROCEDURE MUST BE SUSCEPTIBLE OF ABUSE OR IS NOT RACIALLY NEUTRAL
Castonguay was a fair cross section claim. The second prong of a fair cross section claim is that representation of the group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community. The third prong of a fair cross section claim is that this underrepresentation is due to systematic exclusion of the group in the jury selection process. In holding that the third prong in a fair cross CT Page 1942 section claim need not be reached when the second prong is not satisfied, the Castonguay court at page 431 stated in part as follows:
 . . . In light of our holding that the defendant failed to satisfy the second prong of Duren, the trial court need not have reached this issue.
This same result was reached in United States v. LaChance, 788 F.2d 856 (1986) (2nd Cir.) where the Court stated:
 Because we have considered that LaChance failed the second prong of the Duren test, we need not consider whether he stated facts sufficient to satisfy the further aspect of that test, that the claimed underrepresentation was due to "systematic exclusion."
This Court believes that the same reasoning of Castonguay and LaChance to an issue "systematic exclusion" under a fair cross section claim should also apply to an issue of whether a selection procedure is susceptible to abuse or is not racially neutral under an equal protection claim.
Accordingly, this Court will not reach the third prong of Castaneda and therefore not decide whether the jury quota system under Section 51-220 was susceptible to abuse or was not racially neutral.
In conclusion, this Court holds that the Petitioner has failed to prove the second prong of substantial underrepresentation for three reasons:
(1) The Petitioner did not present any evidence as to the actual number of observed Blacks on any grand jury over any period of time;
(2) The Petitioner did not present any evidence of two or three standard deviations regarding either the expected number of Blacks in the array using the town quota system, or under the tolerable range; and
(3) The Petitioner did not present any evidence of the probability of the number of Blacks in either the 95 percent or 99 percent tolerable range, or fewer, being selected if selection was by representation of adult population. CT Page 1943
The Petitioner has therefore failed to prove an Equal Protection violation under the federal or state constitution.
 III. THE PETITIONER'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM
 A. STANDARD FOR PETITIONER TO OBTAIN REVIEW OF CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL
The threshold issue is whether the deliberate bypass standard or the cause and prejudice standard is the appropriate standard for a Petitioner to obtain review of a claim of ineffective assistance of trial counsel and/or appellate counsel. This issue was raised in Valeriano v. Bronson, 209 Conn. 75 (1982).
Valeriano teaches that the deliberate bypass standard is the appropriate standard to use and further that that standard is automatically satisfied when a claim of ineffective assistance of trial counsel and/or appellate counsel is raised. Valeriano stated in part at page 85 as follows:
 We conclude that when a petitioner raises a claim of ineffective assistance of appellate counsel because his attorney did not raise an issue on direct appeal, the deliberate bypass standard should be utilized. We also conclude that any claim invoking ineffective assistance of appellate counsel automatically satisfies the deliberate bypass requirement. In State v. Leecan (citations omitted), we decided to permit review of all claims of ineffective assistance of trial counsel in habeas corpus proceedings. In such instances, we assumed the deliberate bypass standard was automatically satisfied. Id. The same posture logically applies to ineffective assistance of appellate counsel claims. Thus, the Petitioner has satisfied the deliberate bypass standard to the extent that his ineffective assistance of appellate counsel claims will be addressed.
It is clear from the above language that the claims CT Page 1944 of ineffective assistance of trial and/or appellate counsel must be addressed on their merits.
In order to analyze the Petitioner's claim regarding ineffective assistance of counsel, it is necessary to review the constitutional basis for the right to counsel. In Strickland v. Washington, 466 U.S. 668, 80 L.Ed.2d 674,104 S.Ct. 2052, the court was faced with determining the proper standards for judging a criminal defendant's contention that he had been deprived of the effective assistance of counsel. The Strickland court held in part as follows:
 In a long line of cases that include Powell v. Alabama, . . . this court has recognized that the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial. The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the federal provisions of the Sixth Amendment, including the Counsel Clause:
 `In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall then previously ascertain by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.'
 . . . the Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing the role that is critical to the ability of the adversal system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to CT Page 1945 ensure that the trial is fair. For that reason, the Court has recognized that `the right to counsel is the right to the effective assistance of counsel.'. . ."
The Strickland court went on to establish a dual requirement of performance and prejudice in order for a conviction to be reversed by stating in part as follows:
 A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction. . . resulted from a breakdown in the adversary process that renders the result unreliable." (emphasis provided).
In discussing the performance aspect of the claim of ineffective assistance of counsel, the Strickland court stated in part as follows:
 The proper measure of attorney performance remains simply reasonableness under prevailing professional norms. . . . In any case presenting an ineffective claim, the performance inquiry must be whether counsel's assistance was reasonable considering all of the circumstances. . . . Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission CT Page 1946 of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'. . . There are countless ways to provide effective assistance in any given case. . . . Thus, a court deciding an actual ineffective claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts of omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. (emphasis provided).
The petitioner correctly recognizes that Connecticut has followed the United States Supreme Court decision in Strickland, supra.
C. THE PERFORMANCE PRONG
In applying the performance standard, it must be remembered that Strickland teaches that every effort must be made to eliminate the distorting effects of hindsight and to CT Page 1947 evaluate the conduct from counsel's perspective at the time. Counsel's failure to pursue a claim for which there was no reasonable basis in existing law constitutes reasonable conduct under prevailing professional norms.
In discussing the failure to raise a grand jury claim as it relates to trial counsel, the court in Tollett v. Henderson, 411 U.S. 258, 266, stated in part as follows:
 The principle value of counsel to the accused in a criminal prosecution often does not lie in counsel's ability to recite a list of possible defenses in the abstract, nor in his ability, if time permitted, to amass a large quantum of factual data and inform the defendant of it. Counsel's concern is the faithful representation of the interest of his client and such representation frequently involves highly practical considerations as well as specialized knowledge of the law. Often the interests of the accused are not advanced by challenges that would only delay the inevitable date of prosecution, see Brady v. United States, supra, 397 U.S. at 751-752, 90 S.Ct. at 1470-1471, or by contesting all guilt, see Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). A prospect of plea bargaining, the expectation or hope of a lesser sentence, or the convincing nature of the evidence against the accused are considerations that might well suggest the advisability of a guilty plea without elaborate consideration of whether pleas in abatement, such as unconstitutional grand jury selection procedures, might be factually supported. (emphasis provided).
In evaluating the conduct of trial counsel's perspective as of 1981, and taking into consideration the fact that all attempts to challenge 52-220 were not successful as of 1981, and further, recognizing that the interests of the Petitioner would not have been advanced by a challenge that at best, if successful, would only delay the inevitable date of prosecution, and further, recognizing that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment, this Court holds that the failure of CT Page 1948 trial counsel to raise a grand jury selection claim was reasonable under prevailing professional norms.
D. THE PREJUDICE PRONG
The Petitioner has also failed to prove the prejudice prong. Even if it is to be assumed that the Petitioner could have successfully raised a challenge to the grand jury selection procedure, this would not have had any effect on the final outcome of the Petitioner's case. The only result of a successful grand jury challenge would have been to "delay the inevitable date of prosecution." Tollett, 411 U.S. 266. As stated in Blackledge, 417 U.S. 30, "even a tainted indictment. . . could have been `cured' through a new indictment by a properly selected grand jury." Secondly, this Court has ruled in this decision that the Petitioner has failed to prove a equal protection claim violation.
Therefore, the Petitioner has failed to prove prejudice from the failure of his trial counsel to raise a grand jury equal protection selection procedure claim.
The Petitioner has therefore failed to meet either the performance prong or the prejudice prong of Strickland and has therefore failed to prove that his counsel rendered ineffective assistance under the Strickland standard.
The petition for writ of habeas corpus is dismissed.
AXELROD, J.